**George HOOD, Plaintiff–Appellant,**

**v.**

**MIDWEST SAVINGS BANK, Defendant–Appellee.**

**No. 02–3525.**

United States Court of Appeals, Sixth Circuit.

April 8, 2004.

Alexander M. Spater, Spater Law Office, Columbus, OH, for Plaintiff–Appellant.

James A. Wilson, Vorys, Sater, Seymour & Pease, Columbus, OH, for Defendant–Appellee.

Before KENNEDY and GIBBONS, Circuit Judges; and ALDRICH, District Judge.*

GIBBONS, Circuit Judge.

Plaintiff-appellant George Hood seeks review of a district court decision which granted defendant-appellee Midwest Savings Bank's (Midwest) motion for summary judgment. On February 21, 1997, Hood filed an action in the United States District Court for the Southern District of Ohio against Midwest alleging, *inter alia,* violations of the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.,* and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.* On May 10, 1999, Midwest filed a motion for summary judgment, which was granted as to all claims except one, which is not at issue here. Because we find that Hood has not been able to establish a prima facie case under the Fair Housing Act or the Equal Credit Opportunity Act with regard to either his first or second loan application, we affirm the judgment of the district court granting summary judgment to Midwest.

**I.**

In 1995, Hood, an African–American, purchased a vacant lot located on Franklin Avenue in the Olde Towne East section of the Near East Side of Columbus, a predominantly African–American neighborhood, for the purpose of building a house.

---

* The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

Hood is certified by the Federal Housing Administration (FHA) as a homebuilder and has built several houses in the past. He obtained plans for the house and intended to serve as the general contractor for the construction, as he had done eight or nine times previously. As the general contractor, Hood needed a loan to pay for supplies and the services of subcontractors.

To get financing for the construction of the house, Hood contacted AM Mortgage Company (AM Mortgage), an independent mortgage broker. Hood dealt with AM Mortgage employees Tony Malone and Heather Bogo. Hood and Malone discussed the types of loans for which Hood could apply and specifically discussed structuring the loan as a construction loan with an end mortgage.[2]

Malone then contacted Midwest regarding Hood's potential loan. Midwest handled a large number of construction loans, which accounted for the majority of its loans. In about half of these construction loans, Midwest allowed the borrower to act as the general contractor. This practice is somewhat rare in the lending industry. Malone submitted Hood's first completed loan application to Midwest in early November 1995. Malone used the Uniform Residential Loan Application form. The application indicated that Hood was applying for a conventional mortgage in the amount of $60,000. In addition, the application included information regarding Hood's assets. Hood disclosed that he had owned property that had been subject to foreclosure within seven years of his application. The application also indicated that Hood is African–American.

Hood's application was received by Midwest and processed by Brian Swope, a loan originator in Midwest's Columbus office. Swope obtained preliminary credit reports for Hood. In Swope's opinion, these reports indicated that Hood had "good credit." After obtaining preapproval from Midwest underwriter David Turner, Swope informed AM Mortgage that Midwest would make the loan. Swope then received Hood's plans for the house, which indicated that the house was to be stick built.[3] Swope was informed that Hood planned to serve as the general contractor. Later, Swope received a "mortgage report," which gave more detailed information regarding Hood's credit history than had the preliminary credit report. This mortgage report revealed that Hood was subject to several tax liens. After reviewing this less favorable report, Swope determined that the loan would have to be done "in-house," meaning that the loan would be of a quality that could not be sold on the secondary mortgage market.

At the same time he requested the mortgage report, Swope also requested title work and an appraisal of the proposed construction. Swope contacted appraiser Barbara Roberts to order an appraisal for Hood's application. According to Swope, Roberts later contacted him and told him that she was unable to complete the appraisal because she could not identify any "comparable sales" in the area. In a letter dated November 21, 1995, from Roberts to Swope, Roberts explained why she could not complete the appraisal as requested. That letter stated in its entirety:

---

**2.** A construction loan is a loan which lasts for the term of the construction and is paid off with a loan backed by a mortgage at the end of construction.

**3.** "Stick built" means that the home was to be constructed entirely on site from raw materials, as opposed to prefabricated or modular homes, which are constructed in whole or in part in factories and then transported to the lot.

The proposed dwelling refernced [sic] in the above, is to be situated within the Olde Towne East/Franklin Park district, on Columbus' east side. The neighborhood is of historical interest, and is at this time in a period of transition. Existing residences of the neighborhood were constructed from 1890 to 1930, predominantly from 1905 to 1915.

A complete review of all available sales within the neighborhood, unfortunately did not vend any usable comparable sales for the purpose of the appraisal. The reason is the great variance in age between the existing structures of the neighborhood and the proposed new construction. The standards set forth within the Uniform Appraisal Code, limit such.

After a discussion with your institution's head Underwriter [sic], Ms. [Kerri] Coffman, I was advised that due to the extreme deviations from normal standards and perimeters [sic] of the appraisal, the complete loan package would not result in a viable, sellable product on the secondary mortgage market. We further discussed the Borrower's net equity, which would not meet standards for minimal requirements to be considered for portfolio investing.

In the best interest of conserving expenses incurred by Mr. Hood, the request for appraisal has been cancelled at this point. An invoice for expenses incurred is enclosed. Should you have any further questions, do not hestitate [sic] to contact me, or please refer to Ms. Coffman.

Swope said that this was the first time in his experience that an appraisal could not be completed because of a lack of comparable sales. Although Swope had already decided by this point that Hood's loan would have to be done in house, he did not ask Roberts whether she could complete an appraisal if the loan would not be sold in the secondary mortgage market. In addition, Swope did not request an appraisal from another appraiser. According to Swope, Roberts told him that "if it were a different house" or had a "different floor plan" she could find comparables and complete the appraisal. Also according to Swope, he then called Hood and told him "I want to do a loan for you. I just can't do it with this house.... You need to get another floor plan or different blueprints, different house." Hood allegedly responded, "Okay, I'll work on it."

In December 1995, Hood called Malone, the mortgage broker, to find out the status of his loan application. Malone told him that his application had been rejected because Midwest could not appraise the house. Malone read Roberts's letter, and then faxed a copy to Hood.

On January 8, 1996, Hood filed a complaint with the Ohio Department of Commerce, Division of Financial Institutions, charging that Midwest was engaging in "redlining."[4] His complaint read, in part:

> Franklin Avenue is a [sic] inner city neighborhood in transition where greater than 50% of the existing homes have been or are under renovation. For the appraiser to conclude that there are no usable sales comparisons of new homes in this neighborhood with which to base

---

4. "Redlining" is generally defined as "mortgage credit discrimination based on the characteristics of the neighborhood surrounding the would-be borrower's dwelling." See Town of Springfield v. McCarren, 549 F.Supp. 1134, 1142 (D.Vt.1982), aff'd mem., 722 F.2d 728 (2nd Cir.1983). "The term derives from loan officers evaluating home mortgage applications based on a residential map where integrated and minority neighborhoods are marked off in red as poor risk areas." Simms v. First Gibraltar Bank, 83 F.3d 1546, 1551 n. 12 (5th Cir.1996).

an appraisal is a thinly veiled effort to redline the project.

A fair approach would have been to take the plans and specifications and performed [sic] a square foot estimate appraisal of this home. I am therefore requesting from your department an advocacy posture in requesting Midwest Savings Bank to respond to fairness and observance of the commitment the financial institutions of Ohio have made against redlining of inner city neighborhoods. Your cooperation will be deeply appreciated.

Thomas Pulfer, President of Midwest, responded to Hood's complaint in a letter dated January 29, 1996:

Mr. John J. Prior forwarded to Midwest Savings Bank the correspondence you mailed to The Ohio Division of Financial Institutions. Let me start our response by emphatically denying that Midwest in any way was involved in any form of redlining. Our mortgage lending records will indicate that Midwest is actively involved in mortgage origination's [sic] in all sectors of Franklin county [sic].

The first reason for the turn down of your loan request was based upon the inability of the appraiser to qualify comparable values and sales due to a new construction being built in an established historical area. Secondly you were expecting the appreciation of the vacant real estate to substantiate for a cash infusion of the required twenty percent down payment. Lastly upon receipt of a detailed mortgage report several credit deficiencies were listed that did not show on the in house credit report.

We regret circumstances are such that Midwest was not able to grant your loan request, however, we are confident our decision was based upon prudent underwriting criteria. If there are any further questions you can call me at 1–800–626–2913.

After receiving Pulfer's response to his complaint, Hood received a telephone call from Malone, the mortgage broker, who told him that the bank had reconsidered his loan application and that it was a "done deal." According to Malone, Midwest wanted Hood to change the architectural facade of the house to correspond with the historical architecture in the neighborhood. Bogo, an employee of AM Mortgage, told Hood that his original application had been lost, and that he would have to submit a new application, along with the necessary supporting materials. Hood submitted a second loan application dated May 8, 1996. On Hood's second application, he indicated, contrary to his first application, that he had not been subject to foreclosure within the prior seven years.

Hood also submitted new house plans along with the second loan application. The extent to which the new plans had been revised is disputed. Hood asserts that his new plans differed from his old plans only in that the facade was altered. He says that no changes were made in the floor plan, and that both sets of plans called for a two-story stick built house. Midwest appears to dispute the exact nature of the plans. Pulfer has testified that Coffman told him that Hood's first proposed home could not be appraised because it was going to be a pre-fabricated, or modular, house, while the second application called for a stick built house. Coffman testified that Hood's initial plans could not be appraised because they called for a one story house. All parties agree, however, that the final plans submitted by Hood called for a two story stick built house.

After Hood submitted the second application with the altered plans, Swope was

able to obtain a satisfactory appraisal of Hood's property. Appraiser Fred Renault appraised the property at $85,000. Swope left Midwest shortly after the appraisal. Coffman asked Jenny Tiffner, an originator in Midwest's DeGraff office, to take over the application from the departed Swope. Midwest says this action was taken because, at the time, all the other loan originators in Midwest's Columbus office were too busy to handle another loan application. Hood points out, however, that in a handwritten memo to Pulfer, Coffman wrote that she referred Hood's application to Tiffner because the Columbus office manager "did not want" the loan for the Columbus office. According to Midwest, Coffman did not inform Tiffner about Hood's redlining complaint, nor did she suggest to Tiffner that Hood's application should be treated differently than any other loan application. According to Hood, Tiffner knew about his complaint because he told her about it.

After completing all the necessary paperwork and "clearing up" Hood's outstanding tax liens, Tiffner submitted Hood's application to Coffman, who served as the underwriter, for final approval. The parties dispute the terms under which the loan was approved.

According to Midwest, Hood's loan was approved as a "one-time closing" construction loan.[5] Midwest asserts that Hood knew that he would be required to make both interest and principal payments from the beginning of the loan term on the full amount of the loan. Midwest says that Tiffner explained the terms of the loan, including payments and the "draw process" to Hood. Midwest specifically asserts that Tiffner explained to Hood that, because he was serving as the general contractor, all construction draw checks would be made jointly payable to Hood and the subcontractor, upon the presentation of receipts for work completed and the completion of satisfactory inspections of the work.

According to Hood, Midwest never told him how his construction loan would be structured. Hood argues that Midwest only told him before the closing that the bank would lend him $67,000 to build his house, that he would receive the money in three draws, and that he would pay interest plus principal on the entire amount of the loan starting immediately after closing. Hood asserts that he was treated differently from other borrowers in that his loan was structured differently. He says that Tiffner never told him that in order to receive draws he would have to be current on both principal and interest payments, nor did she explain to him that he would

---

**5.** According to Midwest, it offers two types of construction loans. The traditional type of construction loan involves two closings. At the first closing, the amount of the construction loan is put into escrow, and disbursements are made as the construction proceeds. The borrower is only required to make interest payments on the amounts disbursed. At the completion of the construction, a new mortgage loan is closed to pay off the full amount of the construction loan. Midwest then sells this new mortgage on the secondary market.

The second type of loan is a "one-time closing" construction loan. With this type of loan, the borrower agrees to make both interest and principal payments from the beginning of the loan term. The amount of the loan is put into escrow and is disbursed as the construction proceeds. One-time closing loans are offered to individuals who meet Midwest's internal underwriting standards, but do not meet the underwriting standards for sale of the loan on the secondary market. Payments are required on both interest and principal because of the borrower's higher credit risk. According to Midwest, because of Hood's history of credit problems, as well as the fact that he was acting as his own general contractor, he qualified only for a one-time closing portfolio loan, instead of the standard construction loan.

have to submit invoices for completed work and that the checks would be jointly payable to Hood and to the subcontractor or supplier.

According to Hood, he asked Midwest to provide the closing documents prior to the closing, and his attorney, Thomas Henderson, requested the settlement documents from the title company the day before the closing. Henderson was told that the settlement documents had not yet been prepared. Midwest provided neither the settlement documents nor any other closing documents prior to the closing.

The closing took place on June 26, 1996, at Northwest Title. Hood, Henderson, and a closing officer were present at the closing. In his deposition, Henderson testified that the closing documents did not reflect his understanding of how the loan was to be structured. Apparently, Hood's understanding was that he would receive the full amount of the loan, $67,245, in three draws, the first of which would be disbursed upon the completion of the foundation, and that he would be compensated for serving as the general contractor. According to Henderson, Hood also understood that "there wouldn't be any money initially." According to Hood, "the documents appeared to indicate that the entire amount of the loan would be disbursed to [me] at the closing, rather than in three draws." In addition, the closing documents were those typically used when a preexisting mortgage is being paid off or when money is being passed directly to the borrower.

Henderson voiced his concerns to the closing officer, who contacted Midwest in an attempt to alleviate Hood's and his own confusion. After speaking with a Midwest employee, the closing officer explained that Hood and Midwest had agreed to separate terms regarding disbursements which were not reflected in the closing documents. According to Henderson, neither he nor Hood understood that the money would be put into an escrow account.[6] In spite of the confusion, Hood decided to proceed with the closing because he "felt that his loan would not be approved unless he went forward on that day." Hood knew that he did not qualify for a typical two-closing construction loan.

Midwest presented a document that it says is an escrow agreement signed by Hood. The purported escrow agreement includes an acknowledgment that $67,245 was being placed in escrow for the comple-

---

**6.** Hood asserts that he did not understand how the loan was structured. However, he gave the following testimony in a deposition:

Q. Well, did you understand that that amount of money was not going to be paid to you at that closing?
A. I didn't receive the check, yeah. I understood I was not going to get a check for $67,000 at the end of the closing, but it simply meant the amount of money that was being lent to me for the construction of the home.
Q: Okay. Had you previously taken out a construction loan in any of the other projects you'd worked on?
A: Yes.
Q. Okay. When you had taken out construction loans, had you signed a mortgage?

A. There's always a closing for the construction loan and another closing for the end loan.
Q. Did you understand that in this case this was going to be the only closing?
A. Correct.
Q. And you understood that this was going to be handled differently than the construction loans you'd taken out in the past, correct?
A. As I found out that morning when I got to the closing, yes.
Q. Well, did you object to having only one closing?
A. If I had, I don't see where I would have gotten the loan.

tion of the construction of a home. The document also states:

> Midwest Savings Bank will release escrow monies upon certification of satisfactory work completion and the borrowers [sic] written authorization. Funds will be disbursed in 4 draws with work to be completed within 9 months of this agreement. Midwest Savings Bank has the sole discretion to inspect and pay out such funds as it deems necessary and proper.

Below this disclosure is a signature that Midwest asserts is Hood's. Hood does not remember signing the document and believes that the signature may not be his. He admits signing all the loan documents except the escrow agreement. Neither Hood nor Henderson remembers the escrow agreement being presented for Hood's signature at the closing. Hood argues that even if he signed the escrow document, it does not constitute an agreement, and he did not agree that Midwest could disburse money at its own discretion and according to its unstated terms. Hood did receive and acknowledge receipt of a "First Payment Letter," which indicates that his first payment of principal and interest would be due on August 1, 1996.

Hood failed to pay the first payment on his loan and did not make any other payments, either. He obtained a building permit in August and began construction by contracting to have the foundation poured. Pursuant to this contract, the footers were poured, the blocks were laid, and the plumbing was roughed in. After this work was completed, Hood contacted Tiffner to request the first draw. Tiffner told Hood that he would have to provide her with all the bills, and that Midwest would then issue a check payable jointly to Hood and the subcontractors. Hood had already paid the subcontractors in cash and therefore did not have any invoices to present.

After learning this, Tiffner spoke with Coffman, who advised Tiffner that if Hood could provide evidence documenting that everything had been paid for, the bank would make an exception to its policy and make the check payable to Hood only.

Henderson, Hood's attorney, contacted Tiffner regarding documentation for the disbursements. He told her that Hood's position was that payment of invoices would not be sufficient because Hood needed money to frame the house. Also, he argued that by paying only invoices, Midwest was charging Hood interest on money that might never actually be disbursed. If the cost of constructing the house turned out to be less than the amount of the loan, Hood would pay interest on money that was not used, and the loan would have to be recalculated and money returned to Hood. Henderson also told her about Hood's concern that Midwest's payment of invoices would not compensate Hood for serving as the general contractor. Henderson agreed to provide documentation of completed work and copies of all bills paid by Hood. He then faxed copies of receipts totaling $3,607.20 to Tiffner.

At about the same time, Tiffner received a phone call from Frank Niven, an employee in Midwest's collections department. Niven told Tiffner that Hood had not made his first loan payment, and was therefore delinquent on his payments. After learning this, Tiffner then contacted Hood and explained that Midwest would not make any disbursements until the loan was brought current. Niven also contacted Hood and Henderson to discuss Hood's failure to make the first two payments. Niven was unaware that Hood had not received any of the loan money, and that the loan was for the construction of a house. Hood says that Henderson and Niven agreed that Midwest would disburse

a draw to Hood for one-third of the loan amount, and that Hood would then remit a portion of that draw to Midwest to bring his loan payments current. Midwest denies that such an agreement was approved. Niven testified in a deposition that this option was discussed, but he did not have the authority to approve such an agreement, and no such agreement was reached. According to both Coffman and Tiffner, such an arrangement is not permitted by bank policy, and they would never have approved it.

On October 10, 1996, Hood received a collection letter from Midwest employee Linda Trewartha informing him that he had breached his contract with Midwest. The letter also stated that if Hood did not cure the breach by submitting $2,811.62 by November 10, 1996, his loan would be accelerated and Midwest could pursue a variety of legal remedies. Henderson contacted Trewartha, who informed him that Hood's loan was not "coded" as a construction loan, but rather as a regular mortgage on an existing property. She said that Hood's difficulty in getting the money disbursed was caused by that error.

To date, Midwest has disbursed no money to Hood under this loan, and Hood remains in default on the loan. The house Hood intended to construct remains unfinished.

## II.

This court reviews a district court's order granting summary judgment de novo. *Nguyen v. City of Cleveland,* 229 F.3d 559, 562 (6th Cir.2000). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party moving for summary judgment "bears the burden of clearly and convincingly establishing the nonexistence of any genuine issue of material fact, and the evidence as well as all inferences therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1133 (6th Cir.1986). The moving party can meet this burden, however, by pointing out to the court that the respondents, having had sufficient opportunity for discovery, have no evidence to support an essential element of their case. *See Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). The party opposing the motion must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A plaintiff may survive summary judgment by establishing a prima facie case and presenting evidence sufficient to reject the defendant's explanation of its conduct. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

## III.

The FHA provides:

It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of

such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

42 U.S.C. § 3605(a). Similarly, the ECOA provides: "It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction ... on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a).

## A. First Loan Application

For purposes of this appeal, Hood argues that Midwest violated the FHA and the ECOA with respect to his first application for a loan in two ways. First, he alleges that Midwest relied on an appraisal report in denying his application that it had reason to believe was based at least in part on the racial composition of the community surrounding the property. Second, he alleges that Midwest denied him the loan because of his race and color and the racial composition of the area where the money would be spent.

■ Twelve C.F.R. § 528.2a prohibits lenders from using or relying on an appraisal of a dwelling which they know, or reasonably should know, "is discriminatory on the basis of the age or location of a dwelling, or is discriminatory per se or in effect under the Fair Housing Act of 1968 or the Equal Credit Opportunity Act." Midwest did not violate this provision, for two reasons. First, Midwest could not have used a discriminatory appraisal because Roberts reported that she could not complete the appraisal. Midwest could not possibly have relied on an appraisal that did not exist. Second, the FHA provides that "[n]othing in this title prohibits a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status." 42 U.S.C. § 3605(c).

Here, Roberts relied on the fact that there were no other houses in the area to which she could compare Hood's proposed house. This explanation for Roberts's failure to complete an appraisal is supported by the fact that Midwest was able to obtain an appraisal from another appraiser after Hood agreed to change the facade to conform to other houses in the area. There is no evidence in the record of any reason that the appraisal was not completed other than unavailability of comparable sales.

■ Likewise, Midwest did not deny Hood's first application for a loan based on his race or color or the racial composition of the neighborhood where the property was located. Hood could have presented either direct or circumstantial evidence of such a denial. See McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (allowing use of either direct or circumstantial evidence in employment discrimination cases). Hood has presented no direct evidence of discrimination by Midwest. Nowhere does Hood allege that Midwest overtly denied his application based on either his race or the location of his property in a predominantly African–American neighborhood. As noted, Hood does allege that, in deciding to deny his first loan application, Midwest relied on an appraisal report, or rather the lack thereof, which was based in part on the racial composition of the neighborhood in which the property was located. However, the letter (which is quoted in its entirety supra page three) does not mention race as a factor preventing Roberts, the appraiser, from completing an appraisal of the property. Rather, the letter says only that there are no comparable sales in the neighborhood to which to compare Hood's proposed house. This is a problem that could arise regardless of the race of the applicant.

■ Thus, there is no direct evidence of racial discrimination in Midwest's denial of

the first loan application. In his appellate brief, Hood argues: "Plaintiff's most compelling evidence is that Mr. Hood was denied the loan because he wanted to construct his house in a predominantly African American, but changing, neighborhood, a practice known as redlining." This conclusory assertion does not constitute direct proof.

Because racial discrimination is rarely overt in the business context, however, discrimination can also be proved by circumstantial evidence. The prima facie case necessary to establish a claim under the FHA or the ECOA using circumstantial evidence is the same. *Saldana v. Citibank*, No. 93 C 4164, 1996 U.S. Dist. LEXIS 8327 at *5, 1996 WL 332451 (N.D.Ill. June 13, 1996). To establish a prima facie case of discrimination under the FHA or the ECOA, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he applied for and was qualified for a loan; (3) the loan application was rejected despite his or her qualifications; and (4) the lender continued to approve loans for applicants with qualifications similar to those of the plaintiff. *Michigan Prot. and Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 346 (6th Cir.1994); *Ward v. Union Planters Nat'l Bank*, No. 95–5921, 113 F.3d 1236, 1997 U.S.App. LEXIS 8657 at *2 (6th Cir. Apr. 23, 1997). Despite the

fact that he has no direct evidence of discrimination, Hood can defeat the motion for summary judgment if he can establish that a genuine issue of material fact exists with respect to each element of his prima facie case. *Ward,* 1997 WL 201483, at ——, 1997 U.S.App. LEXIS 8657 at *8. If Hood can do this, the burden will then shift to Midwest to articulate a legitimate, nondiscriminatory reason for the denial. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (applying the burden shifting framework in the employment discrimination context).[7] Hood bears the ultimate burden of establishing his claim of race discrimination by a preponderance of the evidence. *See id.*

Hood is able to meet his burden with respect to the first element. Both Hood and Midwest agree that Hood, as an African–American, is a member of a protected class, and that the property is located in a predominantly African–American community. Hood also arguably meets his burden with respect to element two. There is no dispute that Hood applied for a loan. While the parties dispute whether he was qualified for the loan, Swope, the first loan originator, gave the opinion that Hood's credit was sufficiently good to obtain the loan.[8] Hood meets his burden with respect to element three. The loan application was rejected.

---

**7.** Hood disputes this characterization of the prima facie case. He argues that a plaintiff can establish a prima facie case of credit discrimination by showing the following four elements: (1) plaintiff was a member of the protected class; (2) plaintiff applied for credit from defendants; (3) plaintiff was qualified for the credit; and (4) despite plaintiff's qualifications, defendant denied her credit application. Hood cites *Mays v. Buckeye Rural Elec. Coop.,* 277 F.3d 873, 877 (6th Cir.2002), as authority for this statement of the elements. This reliance, however, is misplaced. *Mays* relies on a Tenth Circuit case, *Matthiesen v. Banc One Mortgage Corp.,* 173 F.3d 1242, 1246 (10th Cir.1999), for this statement of the

elements. The elements of the test, however, had already been set forth by the Sixth Circuit by the time *Matthiesen* was decided. *See Michigan Prot. & Advocacy Serv., Inc.,* 18 F.3d at 346. Since the *Matthiesen* court did not acknowledge *Michigan Protection & Advocacy Service* or attempt to distinguish it in any way, it appears likely that an exact statement of the elements was not critical to the decision in *Mays* and that the court simply overlooked the existing Sixth Circuit formulation.

**8.** Midwest asserts that Hood did not qualify for the loan because the appraiser could not fix a value for his property. The lack of an appraisal is undisputed and could be a basis

■ The critical issue for purposes of this appeal is element four: Did Midwest continue to approve loans for applicants with qualifications similar to those of Hood? We conclude that Hood has failed to present evidence from which a finding could be made that Midwest approved such applications. While Hood "does not have to show an exact match between his application and the applicants outside of the protected class who received a loan, the comparator loan files must be 'significantly parallel in every material respect.'" *Sallion v. SunTrust Bank, Atlanta*, 87 F.Supp.2d 1323, 1330–31 (N.D.Ga.2000). Hood has produced several loan files for comparison. Yet Hood does not attempt to compare his own qualifications to these other applicants; he simply relies on the fact that these applicants received loans, while he did not. Of the applications Hood has advanced, only one can be said with certainty to be from an applicant outside the protected class.[9] While this application, from Brien and Rhonda Malicote, did show "some past credit problems," their past financial difficulties did not approach in severity the foreclosure that Hood had experienced. Hood has not created a genuine issue of material fact as to the fourth element of his prima facie case.

## B. *Second Loan Application*

■ Hood argues that Midwest violated the FHA with respect to his second appli- cation for a loan by discriminating against him in structuring the loan and by refusing to disburse any monies under the loan in violation of 42 U.S.C. § 3617. To state a claim under § 3617, the plaintiff in this case must establish (1) that he exercised or enjoyed a right guaranteed by §§ 3603– 3606; (2) that the defendant's intentional conduct constituted coercion, intimidation, threat, or interference; and (3) a causal connection between his exercise or enjoy- ment of a right and the defendant's con- duct.

Hood meets element one. 42 U.S.C. § 3605(b)(1)(A) covers the making or pur- chasing of loans or providing other finan- cial assistance for purchasing, construct- ing, improving, repairing, or maintaining a dwelling. Hood also meets element three. There was a causal connection between Hood's exercise of his right to apply for a loan and Midwest's conduct in processing his loan application and the administration of his loan. Hood fails, however, to raise a genuine issue of material fact with regard to element two. Midwest's conduct did not constitute coercion, intimidation, threat, or interference.

As Hood points out, this Court has stat- ed that interference "has been broadly ap- plied to reach all practices which have the effect of interfering with the exercise of rights under federal fair housing laws."

for finding that no genuine issue exists as to the third element. We leave this issue unre- solved because the analysis of the fourth ele- ment is straightforward and determinative of the prima facie case inquiry.

9. The dissenting opinion disagrees with our reliance on this fact in determining whether Hood has created a fact issue with respect to the fourth element of his prima facie case. The dissent is correct in noting that discrimi- nation can on occasion motivate a decision, even when a direct comparison to one outside the protected class is unavailable. This obser- vation, however, does not assist Hood in any way. Hood presents no evidence from which a trier of fact could infer that racial discrimi- nation motivated the denial of his first loan application. Similarly, there is no evidence that Midwest's stated basis for denial was pretextual. Even if we found that Hood had created a genuine issue of fact with respect to his prima facie case, his evidence is insuffi- cient to permit a trier of fact to find that he has carried his ultimate burden.

*Michigan Prot. & Advocacy Serv. v. Babin,* 18 F.3d 337, 347 (6th Cir.1994). However, the statute must not be given as broad an interpretation as Hood urges. Hood correctly points out that Midwest required him to pay both principal and interest on the full amount of the loan from the loan's inception, rather than interest only (as with most other construction loans), and that after he missed the first payment, Midwest refused to disburse funds under the loan agreement. It may be the case that these actions "interfered" with Hood's ability to borrow money to build his house within the common understanding of the word. However, we will not say that a bank "interferes" with a person's rights under section 3617 every time it declines to grant a construction loan on terms favorable to the borrower. Midwest offered two types of construction loans, one of which was granted to Hood. The bank commonly offered exactly this kind of one time closing loan to other applicants whose loans would not be suitable for sale on the secondary mortgage market. Hood was required to make principal and interest payments from the beginning due to his history of credit problems and the fact that he was acting as his own general contractor, which posed additional risk to Midwest. Far from interfering with Hood's rights under federal fair housing laws, Midwest was simply following its normal business practices in dealing with Hood's second loan application.

## IV.

For these reasons, the district court's grant of summary judgment to Midwest is affirmed.

ALDRICH, District Judge, Dissenting.

I join the panel's opinion in full with respect to its statement of the facts of this case. Because I believe that the panel articulates an unduly burdensome standard with regard to the establishment of a *prima facie* case of discrimination under the Fair Housing Act and the Equal Credit Opportunity Act, I respectfully dissent.

It is clear, as the panel notes, that Hood did not present direct evidence of racial discrimination pursuant to Midwest's denial of his first loan application. The success of Hood's suit therefore rests on his ability to make out a *prima facie* case using circumstantial evidence. The panel is indisputably correct in its articulation of the first three prongs of the test for establishment of such a *prima facie* case, namely: (1) that Hood was a member of a protected class; (2) that Hood applied for credit from Midwest; and (3) that Hood was denied credit, despite his qualifications. *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

I question the panel's analysis, however, as it applies to the disputed fourth prong of the *McDonnell Douglas* test. Here, precedent offers only diminutive and muddled guidance. The panel relies upon *Michigan Protection and Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 346 (6th Cir. 1994) and a more recent unpublished decision, *Ward v. Union Planters National Bank,* 1997 WL 201483, 1997 U.S.App. LEXIS 8657 (6th Cir.1997), in requiring Hood to show that "(4) the defendants continued to engage in that type of transaction with other parties with similar qualifications." *Id.*

However, merely articulating such a requirement does not dispose of the inquiry, or of Hood's claims. Hood argues that he can show that defendants continued to engage in the relevant transactions. In dismissing this argument, the panel, like the District Court, reads "other parties" to mean other borrowers not in the protected class. (The District Court demanded a showing that "Midwest approved loans for *nonminority* applicants with similar qualifications." (emphasis added))

Yet the holdings relied upon by the panel do not necessitate such a reading of "other parties." In *Michigan Protection and Advocacy Services,* we upheld a grant of summary judgment after determining that the plaintiffs failed to allege a proper "real estate-related transaction" under prong (2), and thus did not proceed to examine the records of any "other parties." 18 F.3d at 346. And while our holding in *Ward* did rest upon the fourth prong, the opinion in that case similarly neglects to address the definition or proper qualifications of "other parties." We held that Ward "had failed completely to introduce any evidence that Union Planters had awarded loan applications to persons of similar qualifications," without pausing to address whether these qualifications must include membership in the relevant protected class. 1997 U.S.App. LEXIS 8657 at *7, 1997 WL 201483.

Yet the United States Supreme Court has joined several appellate courts in rejecting such a requirement in other discrimination contexts. With regard to age discrimination, the Court has held, "[t]he fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out because of his age." *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996).

For purposes of Title VII, this Court has noted that "the plaintiff, as part of *a prima facie* case, [need not] show that he or she was replaced by a person outside the protected class." *Jackson v. Richards Med. Co.,* 961 F.2d 575, 587 n. 12 (6th Cir.1992) (citations omitted). *See also Walker v. St. Anthony's Med. Ctr.,* 881

F.2d 554, 558 (8th Cir.1989)(finding no *"per se* requirement" that female employee be replaced by a man). "Congress never intended to give an employer license to discriminate against some employees ... merely because he favorably treats other members of the employees' group." *Brown v. Henderson,* 257 F.3d 246, 253 (2d Cir.2001).

In treating cases in which discriminatory animus is alleged for the refusal to extend credit to an applicant, we should articulate a standard which takes note of these holdings, while also recognizing the unique nature of the real-estate lending context.[10] This is precisely what the Fifth Circuit did in *Moore v. United States Dep't of Agriculture,* 55 F.3d 991 (5th Cir.1995). In that case, the court upheld a District Court's decision which "borrowed freely from the wealth of Title VII case law to craft the elements of an ECOA *prima facie* case," and dropped the fourth requirement altogether. *Id.* at 993 n. 4.

Better still, it seems, is the approach favored by courts, including this one, in other types of real estate cases. For example, in *Selden Apartments v. United States Dep't of Housing & Urban Dev.,* 785 F.2d 152, 159 (6th Cir.1986), a case involving discriminatory denial of housing, we required merely "[t]hat the housing or rental property remained available" after the denial. *Id.*

To fit the demands inherent in these kinds of circumstances, and in recognition of the often imprecise nature of available information regarding the "qualifications" of future approved applicants, this Court should follow these examples, and borrow freely from analogous cases to craft the elements of an ECOA *prima facie* case. I

---

**10.** For example, in an employment discrimination case, courts can look at the applicant actually selected for a position in order to determine the presence or absence of discrimination. However, in credit cases, future applicants do not apply for the same loan as a plaintiff such as Hood. Instead, an almost infinite number of persons apply for credit from the defendant's reserve of funds.

would allow the burden to shift back to defendants following a showing that a creditor such as Midwest simply *remained in the real-estate loan business* after denying credit.

If Hood could present satisfactory evidence that Midwest continued to engage in loan transactions after denying his application, then analysis of his claim should proceed to the next phase, during which Midwest would be given the opportunity to rebut the presumption of discrimination. *See McDonnell Douglas, supra.*

Because in granting Midwest's motion for summary judgment, the District Court employed an overly burdensome standard for establishment of a *prima facie* case, I would have remanded the case for further consideration under a more appropriate standard. Because the panel in its opinion affirms the holding of the District Court, I respectfully dissent.