NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0166n.06

No. 23-1705

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

KALVIN SCHANZ,

    Plaintiff-Appellant,

v.

CITY OF OTSEGO, MICHIGAN et al.,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)

FILED
Apr 15, 2024
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF MICHIGAN

OPINION

---

Before: LARSEN, READLER, and DAVIS, Circuit Judges.

LARSEN, Circuit Judge.  Kalvin Schanz bought a building in Otsego, Michigan, and explored the possibility of converting it into dormitory-style housing for nearby immigrant workers.  In response to that idea, he claims, local officials intimidated and retaliated against him in violation of the Fair Housing Act.  He also asserts that one official violated his procedural-due-process rights.  So Schanz sued the City of Otsego and several of its officials and employees under the Fair Housing Act and 42 U.S.C. § 1983.  The district court entered summary judgment in favor of defendants.  We AFFIRM.

I.

In May 2013, Kalvin Schanz purchased a vacant school building located at 313 West Allegan Street in Otsego, Michigan.  Schanz had no particular plans in mind when he bought the building, but over the years he entertained ideas for several development projects.  This lawsuit springs from an idea that Schanz's friend, Brian Winn, suggested to him.  Winn told Schanz that JBS Foods USA, which operated a meatpacking facility near Otsego, was in search of housing for

some of its employees. Many JBS employees were immigrants and religious refugees who required assistance in finding housing. Schanz thought that the school building could be outfitted to provide dormitory-style housing to some of these employees, so, in 2017, he arranged for several JBS representatives to tour the building with him and a developer.

Schanz claims that his idea of providing housing to JBS's immigrant employees provoked opposition from two City of Otsego officials: Dave Rayman, the Economic Development Director; and Aaron Mitchell, the City Manager. Rayman had been Otsego's Economic Development Director since 2009. But he was not on the City's Planning Commission, and he had no role with respect to building code inspections or site plan approvals. As City Manager, Mitchell was a member of the Planning Commission. But he did not assume this role until 2018; before that, he worked for another municipality.

Schanz says that he mentioned the idea of housing JBS employees to Rayman and Mitchell repeatedly over several years, but that they insisted that it would "never happen[]," that Schanz would "get run out of town for that one," and that the "building will have to come down." R. 112-2, Schanz Dep.1, PageID 1491, 1494. Schanz characterizes these responses as racist. And Schanz's friend Winn testified that Rayman said "the city w[ould] never allow [Schanz] to run a refugee camp out of that school." R. 121-1, Winn Dep., PageID 1753. Schanz was "pissed off" and "embarrassed . . . that some person would have a problem with them nice people working over at that factory." R. 112-2, Schanz Dep.1, PageID 1491. So, he claims, he would mention the issue to Rayman or Mitchell "every couple months"—in part, he says, to "prod[] them a little after [he] knew that it offended them." *Id.* at 1493. Rayman denies ever expressing opposition to Schanz's idea of housing JBS's immigrant employees, and Mitchell says that he had never heard of the idea until this lawsuit was filed.

Despite his alleged persistent comments to Rayman and Mitchell concerning the development idea, Schanz never took steps to get his plan off the ground. He had only one meeting with JBS representatives, and he asserts that he "never met or talked to any JBS employees except for that meeting, period." *Id.* at 1492. He admits that he has no knowledge of whether "JBS had an interest in [the] building," but he notes that "[a]t the meeting they were very nice to [him]." *Id.* at 1494. And Schanz "never filed" any application with the City of Otsego that would have been necessary to commence his contemplated project. *Id.* Nor did he ever speak to or interact with any of the immigrant employees of JBS who were, in his vision, the prospective tenants of the school building. Besides the single meeting with JBS representatives, the only tangible step that Schanz took to advance his idea was to brainstorm with his friend Winn, a contractor, which resulted in some handwritten cost estimates on a piece of notebook paper. But their brainstorming did not lead to any action—Schanz never hired a contractor or engineer, never secured financing, and never filed paperwork or attempted to appear before any local building or zoning body.

In subsequent years, Schanz explored other possible plans for the building. At one point, he tried to work with a developer to get public grants for low-income housing, but that went nowhere. Later, he entered into a purchase agreement with another housing developer, but the buyer backed out after determining that the project was not financially feasible. Still, over the years, Schanz continued to make comments to Rayman or Mitchell about housing JBS's immigrant employees.

On several occasions in 2020, Schanz experienced problems with break-ins and vandalism at the building. He says that tensions arose between him and the police department regarding his habit of leaving the windows open and unsecured. On one occasion in mid-July of that year, the police had to search the building for "a prowler reported in the area." R. 108-17, Weber Dep.,

PageID 1429. The responding officer, Brandon Weber, called for backup because he was concerned about searching a large, unsecured building alone. After Weber's dispatch to the building in mid-July 2020, he wrote to several city officials, including Mitchell, complaining of Schanz's "fail[ure] to take even the most basic steps to secure the building." R. 108-7, Weber Email, PageID 1308. In his view, the building was "an attractive nuisance" and "a significant safety hazard," especially for the school children who, he said, frequented it. *Id.* at 1309. Keeping watch of Schanz's building was, Weber thought, "an egregious misuse of police resources," so he asked for advice on how to "mitigate this problem." *Id.*

Mitchell responded that, "unfortunately," a potential purchaser of the building had backed out of its deal with Schanz. *Id.* at 1308. Thus, they would have to "deal with [Schanz]" and "do something to get this building buttoned up." *Id.* According to Weber, Mitchell also separately told him that he should "get some pictures" of the building's interior the next time he did "door checks and perimeter checks." R. 108-17, Weber Dep., PageID 1431. That way, they could send the pictures to the code inspector for a health and safety evaluation. So, on July 28, 2020, Weber entered the school building and took forty photographs of what seemed to him to be health and safety concerns. Weber composed a report and sent it to Mitchell and the code inspector, Bret Reitkerk.

After receiving Weber's report, Reitkerk issued a demolition letter for the school building on August 24, 2020. The letter explained that "[a] police report shows consistent break-ins, failures in the roof system, mold, interior fall hazards, and an obvious lack of maintenance," and that "[t]he building is abandoned, neglected, and unsecured." R. 112-14, Demolition Notice, PageID 1619. The letter informed Schanz that he had "the right to appeal this notice" by sending "a written request for an appeals meeting within 20 days upon receipt of this notice." *Id.* at 1620.

Reitkerk sent the letter to Schanz by certified mail, using the mailing address listed on the tax records for the school building. As it turned out, that address was the home of Schanz's mother, and Schanz did not live there. (He lived two doors down.) His mother signed for the letter on September 4, 2020. Schanz claims that he did not receive the letter from his mother until October. However, having heard around town that he was going to be "dinged" by the City, in September Schanz texted Rayman and Mitchell asking for "a copy of this notice everybody is talking about," but to no avail. *Id.* at 1474. On September 21, he went to Reitkerk's office and "begg[ed]" for the letter. *Id.* at 1476. Schanz did not receive a copy of the letter, but he and Reitkerk exchanged words about the possibility of appealing the demolition notice or challenging it in court.

On March 23, 2021, the City of Otsego initiated an ordinance enforcement action against Schanz in state court. The day before trial was set to begin, the City and Schanz, through counsel, reached a settlement agreement by which the City would dismiss its enforcement action without prejudice and Schanz would allow City representatives to inspect the building. Despite the parties' agreement, however, Schanz instructed his attorney to deny entry to the City's representatives when the time came for their scheduled inspection. Eventually, an inspection took place on September 8, 2022; Schanz corrected the relevant deficiencies, and the City rescinded its demolition notice. The City represents that there are currently no issues relating to the condition of the building.

In the meantime, Schanz, through different counsel, filed the instant suit in federal court, seeking damages for violations of the Fair Housing Act (FHA), the Fourth Amendment, and the Fourteenth Amendment. As relevant to this appeal, the operative complaint names as defendants the City of Otsego and Mitchell, Rayman, and Reitkerk, each in their individual and official capacities.

After extensive discovery, defendants moved for summary judgment on all claims, and Schanz moved for summary judgment on his Fourth Amendment claim. The district court granted defendants' motion and denied Schanz's motion. Schanz timely appealed.

II.

On appeal, Schanz contends that the district court erred in entering summary judgment on his claim under the FHA and on his procedural-due-process claim under the Fourteenth Amendment. He does not renew his Fourth Amendment claim. We review a district court's grant of summary judgment de novo. *Huckaby v. Priest*, 636 F.3d 211, 216 (6th Cir. 2011). "Summary judgment is proper when the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1021 (6th Cir. 2024) (quoting Fed. R. Civ. P. 56(a)). Because Schanz bears the burden of proof at trial, he can survive a summary-judgment motion only if he "has presented a jury question as to each element" of his claim—that is, if he has presented "evidence on which the trier of fact could find" in his favor. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (citation omitted). At this stage, we view the evidence in the light most favorable to Schanz and draw all reasonable inferences in his favor. *Rafferty v. Trumbull County*, 915 F.3d 1087, 1093 (6th Cir. 2019).

We first address Schanz's FHA claim and then turn to his procedural-due-process claim.

A.

1.

Schanz brings his FHA claim against Mitchell, Rayman, and the City of Otsego. Before we reach the merits of this claim, however, we address defendants' suggestion that Schanz lacks standing. To establish Article III standing at the summary-judgment stage, Schanz must put forth

evidence, with respect to each claim, showing that defendants' actions caused him an injury in fact that is redressable in these proceedings. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 431 (2021).

Defendants argue that Schanz fails at this threshold step because Schanz's plans were too speculative to turn the school building into a "dwelling" covered by the FHA. *See* 42 U.S.C. § 3602(b) (defining "[d]welling" to include "any building . . . intended for occupancy as[] a residence"). This reasoning is mistaken. If the building is not a "dwelling" under the FHA, Schanz might lack a valid claim to relief under the statute.[1] But that would not defeat Schanz's standing for Article III purposes. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014). To have standing Schanz must "show only that he 'has a right to relief *if* the Court accepts [his] interpretation of the constitutional or statutory laws on which the complaint relies.'" *Ward v. NPAS, Inc.*, 63 F.4th 576, 582 (6th Cir. 2023) (alteration in original) (quoting *CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 488 (6th Cir. 2021)). In other words, "just because a plaintiff's claim might fail on the *merits* does not deprive the plaintiff of *standing* to assert it." *Id.* (brackets omitted).

We are satisfied that Schanz has standing to bring his § 3617 claim for damages. For purposes of evaluating standing, we assume that Schanz's statutory arguments are correct. *Id.* And Schanz has presented evidence that, if believed, could show that Rayman repeatedly threatened to have Schanz's building demolished and, eventually, in coordination with Mitchell, caused the City and its representatives to issue a baseless demolition notice and enforcement action against Schanz. At this stage of the litigation, that is sufficient to establish an injury in fact. *See*

---

[1] To be clear, we express no view regarding whether or how a "dwelling" must be involved for there to be a violation of 42 U.S.C. § 3617.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). This injury can be redressed by an award of damages by a federal court. *See* 42 U.S.C. § 3613(c)(1) (authorizing a court to award "actual and punitive damages"). Accordingly, Schanz has standing to bring his FHA claim, and we proceed to the merits.

2.

Schanz brings his claim under 42 U.S.C. § 3617. That provision of the FHA makes it

> unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

Of these latter sections, Schanz says § 3604 is relevant here. It "prohibit[s] various forms of discrimination relating to housing" on the basis of race, color, religion, sex, familial status, or national origin—such as "mak[ing] unavailable or deny[ing] a dwelling" or "discriminat[ing] . . . in the terms, conditions, or privileges of sale or rental of a dwelling." *Hidden Village, LLC v. City of Lakewood*, 734 F.3d 519, 528 (6th Cir. 2013); 42 U.S.C. § 3604(a). To prevail on a claim under § 3617's "aided or encouraged" clause, a plaintiff must prove that: (1) he "aided or encouraged another's enjoyment of the housing rights protected by §§ 3603–06"; (2) the defendant engaged in conduct amounting to coercion, intimidation, threat, or interference; and (3) there was a nexus between the defendant's interference and the underlying FHA rights. *Linkletter v. W. & S. Fin. Group, Inc.*, 851 F.3d 632, 638–40 (6th Cir. 2017) (cleaned up); *see Hood v. Midwest Sav. Bank*, 95 F. App'x 768, 779 (6th Cir. 2004). A plaintiff must also "demonstrate 'discriminatory animus'" on the part of the defendant. *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 613 (6th Cir. 2012) (quoting *Mich. Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 347 (6th Cir. 1994)).

The district court concluded that Schanz failed to create a triable issue of fact on the first element, and we agree. Although we have never delineated the precise contours of the "aided or encouraged" element, Schanz's evidence fails to satisfy any plausible interpretation of it. Our most relevant case is *Linkletter*. There, the plaintiff had signed a petition supporting residents of a women's shelter in their ongoing dispute with an insurance company, which was seeking to force the shelter out of the neighborhood and acquire the property. 851 F.3d at 636, 638–39. The plaintiff had accepted an offer of employment from the same insurance company. *Id.* at 635. But the insurance company rescinded the offer, citing the plaintiff's support for the shelter as its reason. *Id.* We held that the plaintiff had adequately stated a claim under § 3617. "A plain-meaning understanding of the word 'encouraged,'" we explained, "clearly covers the act of signing a petition advocating support for a women's shelter." *Id.* at 639. This was especially true given the "timing of the petition," which the plaintiff had signed "while the dispute between the shelter and [the insurance company] was ongoing." *Id.* at 638, 636.

Schanz, by contrast, has presented no evidence that he did anything that aided or encouraged, or that even had the prospect of aiding or encouraging, JBS's immigrant employees in their pursuit of housing. There is no evidence that any of the employees were interested in, or even aware of, Schanz's plan. Schanz admits that he never spoke to or tried to reach any such person. He also admits that he had no further contact with JBS representatives after his sole meeting with them in mid-2017, and that he does not know whether the company had any interest in the building. And Schanz never attempted to file a single application to obtain the necessary approvals to develop the building for his stated purpose.

Schanz, in short, would like to premise § 3617 liability on evidence that he manifested a speculative *desire* to aid or encourage others in the exercise or enjoyment of their FHA rights. But

§ 3617 prohibits interference "with any person . . . on account of his *having* aided or encouraged any other person in the exercise or enjoyment" of FHA rights, not on account of having an abstract, future intention to do so. 42 U.S.C. § 3617 (emphasis added); *see Linkletter*, 851 F.3d at 639 (considering the "plain-meaning understanding of the word 'encouraged'").

This is not to say that a plaintiff's actions can come within the protection of § 3617 only if the plaintiff's aid or encouragement is efficacious. As *Linkletter* suggests, advocacy may constitute protected conduct. But we do not need to define the precise boundary between protected and unprotected conduct; wherever it is, we are confident that something more than stray comments or idle talk is required. Schanz's conversations with Mitchell and Rayman do not amount to protected conduct because they had no prospect of aiding or encouraging the immigrant employees at JBS. Rayman was not even a relevant decisionmaker for the fate of the building. Mitchell did have a role on the Planning Commission once he became City Manager, but he was not in office in 2017, the only year during which Schanz made even the slightest efforts to explore a plan to house the employees. Schanz is sparse on the details of what his exchanges with these men entailed, but even he does not characterize his comments as being aimed at any practical objectives: he testified that he would mention the topic to them to "prod[]" and "poke[] them a little," because he thought they were offended by the idea of "some brown folks . . . mov[ing] in there." R. 112-2, Schanz Dep.1, PageID 1493. And he denies that his comments sparked "big, long conversations"—just "the dumb look of scoff, of get real, it ain't happening." *Id.* at 1494. Schanz's comments, untethered from any indications of a practical intention to advance his hypothetical plan, could not have aided or encouraged anyone in the exercise or enjoyment of FHA rights.

Accordingly, we affirm the district court's grant of summary judgment to Mitchell, Rayman, and the City on Schanz's FHA claim.

B.

Schanz also contends that the district court erred in granting summary judgment to Reitkerk on the 42 U.S.C. § 1983 claim for a violation of procedural due process. To prevail on a procedural-due-process claim, a plaintiff must prove that: (1) he had a constitutionally protected interest, (2) the government deprived him of that interest, and (3) the government did not afford him constitutionally adequate process. *Golf Village N., LLC v. City of Powell*, 42 F.4th 593, 598 (6th Cir. 2022). Because the Constitution does not create property interests, we look to "an independent source such as state law" to determine whether a plaintiff has identified an interest protected by the Due Process Clause. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

Schanz brings this claim against Reitkerk for allegedly failing to timely provide him with the demolition notice. But Schanz has not shown that he was deprived of a property interest. The City eventually dismissed its state-court enforcement action and rescinded its demolition notice, so his building was never demolished. To the extent Schanz believes that Reitkerk did not follow the appropriate procedures before issuing the demolition notice, this gets him nowhere: he does not have a property interest in procedures themselves. *Richardson v. Township of Brady*, 218 F.3d 508, 517–18 (6th Cir. 2000). Similarly unavailing is his argument that the demolition notice reduced the market value of his property by requiring him to disclose the notice to any buyer during the pendency of the demolition matter. Not only does Schanz fail to offer any evidence that the property value was reduced, either while the demolition matter remained pending or after its resolution; but this argument also turns on the premise that the *notice itself* deprived Schanz of a

property interest. Yet Schanz has identified no authority to support the notion that state law confers on him a property interest in being free of a notice of an appealable building-code order and of any market consequences it might entail.

Schanz's procedural-due-process claim fails because he has presented no evidence that he was deprived of a protected property interest.

\* \* \*

For the foregoing reasons, we AFFIRM the judgment of the district court.