RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0287p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

LORRIE THOMPSON,

                *Plaintiff-Appellant,*

      *v.*

BANK OF AMERICA, N.A., et al.,

                *Defendants-Appellees.*

No. 14-5561

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:13-cv-00817—Todd J. Campbell, District Judge.

Decided and Filed:  December 5, 2014

Before:  SILER, SUTTON, and STRANCH, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:**  Carol A. Molloy, Lynnville, Tennessee, for Appellant.  Edmund S. Sauer, Frankie N. Spero, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, for Appellees.

_____

**OPINION**

_____

SILER, Circuit Judge.  This appeal concerns the extent to which the securitization of a mortgage note might affect the borrower's obligations to repay the loan or cloud the property's title.  Lorrie Thompson was facing foreclosure.  She asked Bank of America (BOA) to modify her repayment plan under the federal Home Affordable Modification Program (HAMP).  BOA denied the modification on the grounds of insufficient documentation, even though she sent BOA the requested documents several times.  She filed suit, seeking to quiet title and alleging, among

1

other things, various theories of fraud. She claims that because her mortgage note was immediately "securitized" (sold to a pool of anonymous investors through a mortgage trust), BOA falsely induced her into signing the mortgage by pretending it was an actual lender. She alleges her title has become clouded on account of the transfer and securitization of the note. She also alleges that BOA fraudulently induced her to seek modification of her repayment plan while either knowing it lacked authority to modify her repayment terms or else intending to drive her into foreclosure by giving her the run-around. The district court dismissed Thompson's claims under Fed. R. Civ. P. 9(b) and 12(b)(6). For the reasons explained below, we **AFFIRM**.

**I.**

In 2006, Thompson signed a $354,800 mortgage note, with American Mortgage Express Corp. (AME) as the lender. Section 1 of the note states: "I understand that the Lender may transfer the Note." The "Prepayment Addendum" to the note states, "Borrower understands that Lender may transfer the Note, the related Mortgage, Deed of Trust, or Security Deed ('Security Instrument') and this Addendum." Similar language appears on the "Prepayment Rider."

The "uniform covenants" section of the deed of trust also states:

The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments . . . and performs other mortgage loan servicing obligations . . . . There might also be one or more changes of the Loan Servicer unrelated to a sale of the Note.

The deed also authorizes the lender to appoint a successor or substitute trustee.

The signature page of the note contains a signed, undated stamp memorializing AME's transfer of the note to Countrywide Bank, NA. The third page of the note is a blank allonge[1] bearing a signed, undated stamp whereby Countrywide Bank, NA transferred the note to

---

[1]An allonge is a slip of paper sometimes attached to a negotiable instrument for the purpose of receiving further endorsements. ALLONGE, Black's Law Dictionary (9th ed. 2009). Under UCC § 3-3-204(a) & cmt., an allonge "is part of the instrument," and is valid even if the instrument has enough space to hold additional endorsements.

Countrywide Home Loans, Inc., and another signed, undated stamp endorsed from Countrywide Home Loans to blank.  BOA purchased Countrywide in 2008 and has possession of the note.

In 2012, Thompson received notice from BOA offering to short-sell her house in lieu of foreclosure.  Thompson responded that she would rather pursue a modification of her repayment terms under the HAMP program.  HAMP is a federal program enacted pursuant to the Emergency Economic Stabilization Act, 12 U.S.C. §§ 5201–61, that gives lenders incentives to offer loan modifications to borrowers who have a mortgage payment-to-income ratio of over 31%.  *See Olson v. Merrill Lynch Credit Corp.*, 576 F. App'x 506, 511 (6th Cir. 2014).  The goal of HAMP is to encourage mortgage holders to renegotiate qualifying loans to reduce the homeowner's mortgage payments to a sustainable level.  *Wilson v. HSBC Mortg. Servs., Inc.*, 744 F.3d 1, 6 n.3 (1st Cir. 2014).

Thompson states that over the next several months she received and complied with numerous, often redundant, document requests related to her modification application.  BOA never granted her request for HAMP relief.  She filed suit against BOA, Mortgage Electronic Registration Systems, Inc. (MERS), and other defendants, including unidentified persons she believes to be anonymous investors who are the true owners of her note.  The district court dismissed her claims for failure to comply with the applicable pleading standards.

**II.**

Although Thompson's memoranda and briefs are not models of clarity, we can summarize the basic theories that underlie her statutory, tort, and property law claims.

Thompson's major claims emerge from the fact that AME sold her debt to a pool of anonymous investors in a series of transactions that she describes as "securitization" of her loan.  She claims securitization has severed whatever contractual relationship she might have had with her lender, AME/BOA, with the effect that BOA is incapable of granting her a loan modification.  Thompson believes she is entitled to a loan modification under the HAMP program.  She claims BOA is only stringing her along, either because BOA lacks authority to grant a modification or because BOA's policy is to avoid granting modifications as BOA would prefer to foreclose.

She also claims to have been victimized by fraud at the time she bought the property. While Thompson admits she received a loan, she describes her entire closing as a sham and claims her mortgage documents were fraudulent. She alleges that because the money that funded her mortgage debt came from a pool of anonymous investors, AME was not a "lender" but "at most an originator." Thompson's theory is that AME provided no "consideration" for the mortgage contract, so the contract with AME is void and the mortgage note is a nullity. She says the "coincidence of the money being received by the closing date" successfully created "the illusion of a loan transaction" with AME. Her theory is that although she received a loan, her contract to repay the loan was between herself and the anonymous investors who funded the loan via several layers of electronic transactions.

Thompson also argues that as her mortgage note changed owners and ended up as part of an investment pool, the investors who acquired and sold her note through the process of securitization may have paid some or all of her debt. She insists that she does not know how much principal she owes on the loan; she needs discovery to uncover how much of her indebtedness might already have been paid by third parties.

Thompson also draws our attention to the use of MERS in the mortgage transactions. MERS is a company that provides mortgage recording services to lenders and allows lenders to trade the mortgage note and servicing rights on the market, with MERS maintaining electronic recordings of each transaction. *See MERS v. Neb. Dep't of Banking and Fin.*, 704 N.W.2d 784, 787 (Neb. 2005). Thompson correctly states that MERS disclaims any ownership interest in the notes that pass through its databanks. She argues that because MERS never held title to the property and never processed funding or payments between herself and the unnamed creditors, any assignment that was processed through MERS was a "sham" that generated a "wild deed." In fact, Thompson claims that the defendants' use of MERS "is at least circumstantial evidence of the intention to commit fraud" because its only purpose is "to cover and shield illegal transactions."

Over the past few years, the district courts in this circuit, particularly in Tennessee, have entertained a spate of civil actions that advance legal theories similar to Thompson's.[2]  Like Thompson's, many of these civil actions are scattershot affairs, tossing myriad (sometimes contradictory) legal theories at the court to see what sticks.  To assist the district courts in addressing this wave of creative litigation, we will address each of Thompson's theories in detail.

Before we discuss these claims from Thompson's amended complaint, we will consider two new allegations she brings before us.  First, Thompson claims "there is a legitimate question of fact as to whether the last page of the note containing the two endorsements . . . has anything to do with" her loan.  This allonge, she says, "has nothing on it linking the page" to her loan.  But Thompson did not raise this argument before the district court.

Second, Thompson challenges the existence of Countrywide Bank FSB in the chain of ownership.  Although Countrywide Bank, NA is "named on documents" pertaining to the loan, Countrywide Bank, FSB is not.  But we take judicial notice of the fact that Countrywide Bank changed its status from a "national association" bank (NA) to a "federal savings bank" (FSB) on March 5, 2007.[3]  Thompson herself is aware that Countrywide Bank FSB was purchased by BOA in 2008.  This argument is a red herring.

---

[2]*See, e.g., Daee v. JP Morgan Chase Bank, N.A.*, No. 3:13-cv-1332, 2014 WL 5107050 (M.D. Tenn. Oct. 10, 2014); *Deutsche Bank Nat'l Trust Co. v. Tibbs*, No. 3:11-0763, 2014 WL 280365 (M.D. Tenn. Jan. 24, 2014); *Hixson v. Wilson & Assocs., PLLC*, No. 1:12-cv-105, 2013 WL 6147826 (E.D. Tenn. Nov. 22, 2013); *Cikovic v. Homebridge Mortg. Bankers Corp.*, No. 12-671-KKC, 2013 WL 5437017 (E.D. Tenn. Sept. 27, 2013); *Pugh v. Bank of Am.*, No. 13-2020, 2013 WL 3349649 (W.D. Tenn. July 2, 2013); *Dauenhauer v. Bank of N.Y. Mellon* ("*Dauenhauer II*"), No. 3:12-cv-01026, 2013 WL 2359602 (M.D. Tenn. May 28, 2013), *aff'd*, 562 F. App'x 473 (6th Cir. 2014); *Mantsevich v. Countrywide Home Loans, Inc.*, No. 1:12-cv-157, 2013 WL 1326963 (E.D. Tenn. Mar. 29, 2013); *Smith v. America's Wholesale Lender*, No. 3-10-0800, 2013 WL 1131006 (M.D. Tenn. Mar. 18, 2013), *aff'd sub nom. Smith v. BAC Home Loan Servicing, LP*, 552 F. App'x 473 (6th Cir. 2014); *Dauenhauer v. Bank of N.Y. Mellon* ("*Dauenhauer I*"), No. 3:12-cv-01026, 2013 WL 209250 (M.D. Tenn. Jan. 16, 2013); *Gilliard v. JP Morgan Chase Bank, N.A.*, No. 3:12-cv-236, 2012 WL 6139922 (E.D. Tenn. Dec. 11, 2012); *Chapman v. Bank of Am.*, No. 3-11-0504, 2012 WL 4090895 (M.D. Tenn. Sept. 17, 2012), *aff'd*, 543 F. App'x 554 (6th Cir. 2013); *Samples v. Bank of Am., N.A.*, No. 3:12-cv-44, 2012 WL 1309135 (E.D. Tenn. Apr. 16, 2012); *Humphreys v. Bank of Am. Corp.*, No. 11-2514-STA-tmp., 2012 WL 1022988 (W.D. Tenn. Mar. 26, 2012).  *Dauenhauer, Smith, Cikovic*, and *Tibbs* all involve the same attorney who represents Thompson.

[3]Office of Thrift Supervision Order No. 2007-08 (March 5, 2007), *available at* http://www.occ.gov/Static/ots/directors-orders/do-2007-08.pdf.

**III.**

Before addressing Thompson's individual claims, we need to address her background argument that the securitization of her mortgage note altered her obligations under the note. On this broad topic we make several observations relevant to Thompson's claims.

First, under Tennessee law, a promissory note is a negotiable instrument, unless it contains a conspicuous statement that it is not negotiable. Tenn. Code. Ann. § 47-3-104. A note can be sold or assigned to another party who then receives the right to enforce the instrument. *Id*. §§ 47-3-201, 203, 301, 302. An assignment of a note is enforceable regardless of whether it is recorded. *W.C. Early Co. v. Williams*, 186 S.W. 102, 103 (Tenn. 1916). An instrument may be enforced by, among others, the "holder" of the instrument. Tenn. Code Ann. § 47-3-301. When an instrument carries a blank endorsement, it becomes payable to the "bearer," meaning whoever possesses the note. Tenn. Code Ann. § 47-3-205.

Second, securitizing a note does not sever the note from the deed of trust. Under Tennessee law, the deed of trust follows the note. Whoever holds the note owns the deed. *See W.C. Early Co.*, 186 S.W. at 103-04; *Clark v. Jones*, 27 S.W. 1009, 1010 (Tenn. 1894).

Third, federal law provides for the creation of mortgage-related securities. *See* Securities Act of 1933, 15 U.S.C. §§ 77a–77aa; Secondary Mortgage Market Enhancement Act of 1984, 1984 Pub. L. 98-440, 98 Stat. 1689. The pooling of mortgages into investment trusts is not some sort of illicit scheme that taints the underlying debt.

Fourth, securitization of a note does not alter the borrower's obligation to repay the loan. Securitization is a separate contract, distinct from the borrower's debt obligations under the note. This means that payments related to the securitization of a note do not function to satisfy the borrower's mortgage obligations. *See Dauenhauer v. Bank of N.Y. Mellon*, 562 F. App'x 473, 480 (6th Cir. 2014).

Fifth, courts have generally upheld the use of MERS in the transfer of mortgage notes. *Samples*, 2012 WL 1309135, at *4 (collecting cases). Courts have also upheld language, like

that found in Thompson's deed of trust,**4** that grants MERS the power to act as agent for any valid note holder, including assigning a deed and enforcing a note. *Id*. Since its founding in 1999, borrowers have attempted, without success, to attack the validity of their mortgage obligations based on the involvement of MERS. *See Dauenhauer*, 562 F. App'x at 479 (quoting *Golliday v. Chase Home Fin., LLC*, No. 1:10-cv-532, 2011 WL 4352554, at *7 (W.D. Mich. Aug. 23, 2011)).

Many of Thompson's arguments boil down to her claim that she believed she would have a traditional borrower/lender relationship with AME, and that AME (now BOA) would have authority to modify the terms of the loan if modification was mutually agreeable (or, as Thompson argues, required under the HAMP program). *See Smith v. BAC Home Loans Servicing, LP*, 552 F. App'x 473, 476-77 (6th Cir. 2014) (analyzing a similar claim). But Thompson's expectations were not realistic under the express terms of the note and deed of trust and under the laws pertaining to negotiable instruments and securities. In light of these five principles, we now address Thompson's claims in detail.

## IV.

When a district court grants a motion to dismiss for "failure to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), we review that decision de novo. To survive a Rule 12(b)(6) motion, a complaint must comply with the pleading requirements of Rule 8(a), which, among other things, requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 667-68 (2009). The court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded factual allegations as true. *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). But a pleading must go beyond "labels and conclusions" or a mere "formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "'[N]aked assertions devoid of further factual enhancement' contribute nothing to the sufficiency of the complaint." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).

---

**4**Thompson's deed of trust states that MERS "is acting solely as a nominee for Lender and Lender's successors and assigns" and that "MERS is the beneficiary under this Security Instrument."

**V.**

Thompson brings a claim to quiet title. She argues that the securitization of her loan has caused the title to become hopelessly clouded. She asks the court to declare her the sole owner of the property, or at least to permit discovery to uncover the identities of the anonymous investors she describes as the true lenders to whom she might owe mortgage payments. Alternatively, Thompson suggests that third parties have already paid off her indebtedness to her actual lender, and because she no longer owes money on the note, she has superior title. A party wishing to obtain quiet title must plead that she has superior title against any other claimants. *See Hoyal v. Bryson*, 53 Tenn. 139, 141 (1871).

Thompson's assertion that she is the only named party who can prove any form of ownership in the property is unavailing. Tennessee is a "title theory" state. When a borrower obtains a mortgage loan to buy the house, the lender, the holder of the note, has title to the property. The borrower must satisfy her mortgage debt in order to obtain title. *See Dauenhauer*, 562 F. App'x at 481. Although Thompson has made conclusory allegations suggesting that unidentified third parties have paid off her debt through the loan securitization process, she makes no factual showing that her debt has been forgiven, cancelled, or fully paid. Also, because Thompson is not a party or third-party beneficiary to the transactions whereby her note was transferred, we fail to see how any of those funds could have been credited to her indebtedness. Until the note is satisfied, the holder of the note has superior title to the property. Nor has the presence of MERS disfigured Thompson's chain of title. Courts have upheld language in deeds of trust that, like Thompson's, explicitly grants MERS the power to act as agent for a note holder. *See id.* at 479.

**VI.**

Thompson has asserted claims of fraud in the inducement, common-law fraud, fraudulent misrepresentation, and negligent misrepresentation. Each of these is governed by Fed. R. Civ. P. 9(b). *See Pugh v. Bank of Am.*, No. 13-2020, 2013 WL 3349649, at *16 (W.D. Tenn. July 2, 2013) (explaining that a negligent misrepresentation claim must satisfy Rule 9(b)). The substance of these torts is governed by state law.

Under Fed. R. Civ. P. 9(b), a party alleging fraud "must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The purposes of Rule 9(b) are (1) to alert defendants to the particulars of the allegations against them so they can intelligently respond; (2) to prevent "fishing expeditions"; (3) to protect defendants' reputations against fraud allegations; and (4) to whittle down potentially wide-ranging discovery to only relevant matters. *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466-67 (6th Cir. 2011). Accordingly, to satisfy Rule 9(b), a plaintiff must (1) specify the time, place, and content of the alleged misrepresentation, (2) identify the fraudulent scheme and the fraudulent intent of the defendant, and (3) describe the injury resulting from the fraud. *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008).

In *Hodge v. Craig*, 382 S.W.3d 325, 342-43 (Tenn. 2012), the Tennessee Supreme Court explained that the terms "intentional misrepresentation," "fraudulent misrepresentation," and "fraud" all refer to the same tort, and expressed its preference for the term "intentional misrepresentation." Thompson's claims for "common law fraud" and "fraudulent misrepresentation" are therefore one and the same. *Hodge* enumerated the elements of intentional misrepresentation as follows:

> To recover for intentional misrepresentation, a plaintiff must prove: (1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation.

*Id*. at 343.

Regarding the separate tort of negligent misrepresentation, Tennessee has adopted the definition found in the Restatement (Second) of Torts § 552, which strictly limits the tort to "commercial" or "business" transactions. *Hodge*, 382 S.W.3d at 344-45; *Robinson v. Omer*, 952 S.W.2d 423, 427 (Tenn. 1997); Restatement (Second) of Torts § 552(1) & cmt. a. Tennessee's formulation of the tort creates liability only when:

(1) the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; and (2) the defendant supplies faulty information meant to guide others in their business transactions; and (3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and (4) the plaintiff justifiably relies upon the information.

*Robinson*, 952 S.W.2d at 427 (quoting *John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 431 (Tenn. 1991)).

To prevail on a "fraudulent inducement" claim, the plaintiff must prove that the defendant (1) made a false statement concerning a fact material to the transaction (2) with knowledge of the statement's falsity or utter disregard for its truth (3) with the intent of inducing reliance on the statement, (4) that the plaintiff reasonably relied on the statement, and (5) that this reliance resulted in an injury. *Baugh v. Novak*, 340 S.W.3d 372, 388 (Tenn. 2011).

Each of these fraud theories requires that the defendant made a false statement of material fact that is designed to induce the plaintiff to rely on it. Thompson essentially alleges two such misrepresentations.

Thompson's first alleged misrepresentation is that at the time of the closing AME withheld the identity of the true lender or lenders. She proffers two different theories on this claim. Thompson's first theory alleges that at the time she signed the mortgage papers, AME and Countrywide had already made plans to sell the resulting note to a pool of investors. Thompson says she has been injured because, without knowing her true "lender," she has "been left trying to obtain a modification from BOA, an entity that did not have the authority to grant her a modification." Thompson's second, related, theory is that AME/BOA, knowing it was not a "secured creditor" or actual "lender," perpetrated a fraudulent scheme to extract fees and payments during the life of the mortgage while obfuscating her chain of title, thus resulting in "damages to her credit and reputation generally."[5]

---

[5]Related to this claim Thompson also argued in her amended complaint (but not in her appellate brief) that BOA used an "inflated appraisal" of her property to trick her into getting a larger loan. We consider this claim abandoned. *United States v. Johnson*, 440 F.3d 832, 845-46 (6th Cir. 2006). Even so, an appraisal does not provide a basis for an intentional misrepresentation claim because an appraisal is an opinion, not a "past or present fact." *See Homestead Grp., LLC v. Bank of Tenn.*, 307 S.W.3d 746, 755-56 (Tenn. Ct. App. 2009).

We agree with the district court that Thompson did not adequately plead a fraud claim in relation to the origination of her loan.  Thompson argues that AME withheld the material fact that it planned to (perhaps immediately) sell her note to another party.  But the originating documents are quite clear that AME reserved the right to sell Thompson's note.  Even viewing the facts in the light most favorable to the plaintiff, AME never represented to Thompson that it would hold or service her loan for any length of time.  Without a plausible material misrepresentation, Thompson has no basis for a claim of fraudulent inducement or intentional misrepresentation at the time of closing.  *See Smith*, 552 F. App'x at 476-77 (6th Cir. 2014) (addressing an identical argument).

Thompson's second alleged misrepresentation is that BOA "intentionally failed to disclose that it would fail to adhere to applicable HAMP guidelines."  These misrepresentations allegedly happened during the period in 2012 and 2013 when she was fruitlessly applying for a modification to her loan repayment terms.  Under Thompson's theory, BOA perpetrated a scheme to induce her "to continually apply for modification after modification[,] increasing the fees charged and the accrued interest in order to foreclose."

While we sympathize with Thompson's frustrating inability to procure a payment modification,[6] she has not articulated a plausible claim of intentional or negligent misrepresentation.  Thompson nowhere alleges that BOA promised to modify her payments under HAMP.  She has not pointed to a false "representation of a present or past fact" to support an intentional misrepresentation claim.  Likewise, assuming that her payment modification application qualified as a business transaction for negligent misrepresentation purposes, Thompson has not identified the faulty information from BOA on which she reasonably relied.  A request for documents is not "faulty information meant to guide others in their business transactions."  Although Thompson asserts she qualified for modification under the HAMP

---

[6]Thompson is not alone.  In its order denying class status in a multidistrict lawsuit against BOA for mismanaging HAMP applications, a Massachusetts district court stated:

> This case demonstrates the vast frustration that many Americans have felt over the mismanagement of the HAMP modification process.  Plaintiffs have plausibly alleged that Bank of America utterly failed to administer its HAMP modifications in a timely and efficient way; that in many cases it lost documents, or pretended it had not received them, or arbitrarily denied permanent modifications.

*In re Bank of Am. Home Affordable Modification Program (HAMP) Contract Litig.*, No. MDL 10-2193-RWZ, 2013 WL 4759649, at *14 (D. Mass. Sept. 4, 2013).

regulations, she has not claimed that BOA promised she would receive a modification if she applied for one, or that she relied on such a promise. At most, BOA informed Thompson that she might qualify. Accepting as true Thompson's allegations that BOA stonewalled her during the modification application process, this conduct does not support a claim for negligent or intentional misrepresentation.

**VII.**

Thompson also alleges that the named defendants intentionally interfered with the contractual relations between herself and unnamed investors (whom she considers the true "lender") that initially funded (or swiftly purchased) her loan from AME. Thompson states that she "unknowingly entered into a contractual relationship" that obligated her "to repay a loan on unknown terms to John Does 1-1000 on terms that were set forth on the promissory note and mortgage that were fabricated and falsified for the 'closing.'" She claims the defendants interfered by withholding the identity of the true lender, *i.e.*, John Does 1-1000. Concerning her injury, Thompson alleges that (1) absent this contractual interference, her debt balance would have been reduced by virtue of the payments made by third parties as her note changed hands; (2) the obfuscation prevented her from reaching her "real creditor" in order to make payments, obtain a modification, or settle the loan; and (3) the obfuscation "convoluted the entire chain of title, causing it to become irretrievably broken and thus uninsurable, unmarketable and worthless." She also says the interference harmed the John Does by preventing Thompson from sending her loan payments directly to them.

The problem is that Thompson has no contractual relationship with the unnamed investors. As the district court found, the defendants "could not interfere with a contractual relationship that does not exist." Thompson's complaints merely assert that a contract exists. She does not identify the contract or make any argument that an implied contract was formed. While she argues to this court that an implied-in-fact contract existed, she failed to adequately plead this theory to the district court.

## VIII.

Thompson also claims she has been victimized through slander of title.  She says that because her closing was a sham, the documents that have been recorded in Williamson County, Tennessee, fraudulently contain the names of entities that have nothing to do with her loan.  To establish slander of title in Tennessee, a plaintiff must prove: (1) that she has an interest in the property, (2) that the defendant published false statements about the title to the property, (3) that the defendant was acting maliciously, and (4) that the false statements proximately caused the plaintiff a pecuniary loss.  *Brooks v. Lambert*, 15 S.W.3d 482, 484 (Tenn. Ct. App. 1999).  Likewise, libel of title occurs when a person,

> without privilege to do so, willfully records or publishes matter which is untrue and disparaging to another's property rights in land as would lead a reasonable person to foresee that the conduct of a third party purchaser might be determined by the publication, or maliciously records a document which clouds another's title to real estate.

*Cowart v. Hammontree*, No. E2013-00416-COA-R3-CV, 2013 WL 6211463, at *13 (Tenn. Ct. App. Nov. 27, 2013).  Both claims require a showing of malice.  An erroneous assertion of title made in good faith will not support a claim of slander or libel of title.  But a statement made with reckless disregard of the property owner's rights or reckless disregard toward the truthfulness of the statement may qualify as malicious.  *Brooks*, 15 S.W.3d at 484.

Thompson alleges that AME conspired with the anonymous investors to misrepresent on the title documents that AME was the lender.  This claim relies on her fraud theories that we have already rejected.  The information in Thompson's recorded documents can only be false, disparaging, or malicious to the extent that Thompson's theories about securitization or MERS are valid.  Because we have determined that they are not, Thompson has not successfully pleaded malice or false statement.

## IX.

Thompson also brings a claim under the Equal Credit Opportunity Act (ECOA), 15 U.S.C. §§ 1691–1691f.  The ECOA prohibits creditors from discriminating against any credit applicant "with respect to any aspect of a credit transaction . . . on the basis of race, color,

religion, national origin, sex, or marital status." *Id*. § 1691(a)(1). One purpose of the ECOA is to eradicate credit discrimination against women, especially married women whom creditors traditionally refused to consider for individual credit. *Mays v. Buckeye Rural Elec. Co-op., Inc.*, 277 F.3d 873, 876 (6th Cir. 2002); *see also Hood v. Midwest Sav. Bank*, 95 F. App'x 768, 778 (6th Cir. 2004) (discussing the elements of an ECOA claim).

The ECOA requires that the creditor take an "adverse action" against the plaintiff. 15 U.S.C. § 1691(d). The ECOA defines "adverse action" as "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." *Id*. § 1691(d)(6). Thompson's complaint—that BOA has refused to modify her repayment terms under HAMP—does not fall within the definition of "adverse action." She fails to state a claim under the ECOA.

## X.

Another of Thompson's theories is that BOA injured her through negligent hiring and supervision. A plaintiff in Tennessee may recover for negligent hiring, supervision, or retention of an employee if she establishes, in addition to the elements of a negligence claim, that the employer had knowledge of the employee's unfitness for the job. *Doe v. Catholic Bishop for Diocese of Memphis*, 306 S.W.3d 712, 717 (Tenn. Ct. App. 2008). Clearly, this requires the plaintiff to identify the employee and explain what the employee did that negligently injured the plaintiff.

The district court found that Thompson failed to identify the employee who negligently harmed her. Although Thompson named no names in the sections of her complaints dealing with negligent hiring, she responds that she did name two BOA employees – Jana Parker and Jason Mullins – in her complaints.

Even assuming that these were the employees Thompson alleges were negligently supervised, she does not point us to any specific negligent behavior on their part. In fact, her theory is that BOA had an intentional policy of training its employees to avoid granting HAMP modifications. If BOA was intentionally training its employees to intentionally defraud its

customers, this theory sounds in fraud, not negligence.  Nor does Thompson specifically address the elements of negligence anywhere in her filings.

## XI.

Thompson has also asked the court to issue declaratory and injunctive relief.  Because Thompson has not adequately pleaded her substantive claims, the court has no basis upon which to declare her the sole title holder and enjoin the defendants from pursuing the collection of payments or foreclosing the property.

**AFFIRMED.**