**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 16a0385n.06

Case No. 15-5796

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 07, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| FEDERAL HOME LOAN MORTGAGE CORPORATION, | ) ) ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | |
| DONALD GILBERT, et al., | ) ) | |
| Defendants, | ) ) | |
| ANDREA LEE GILBERT, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR |
| Third Party Plaintiff-Appellant, | ) ) | THE WESTERN DISTRICT OF TENNESSEE |
| v. | ) ) | |
| FEDERAL HOME LOAN MORTGAGE CORPORATION, | ) ) ) | |
| Counter Defendant-Appellee, | ) ) | |
| WELLS FARGO BANK, N.A., | ) ) | |
| Third Party Defendant-Appellee. | ) | |

BEFORE: DAUGHTREY, MOORE, and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. When Wells Fargo foreclosed on Andrea Gilbert's home in 2010, she refused to leave, claiming that the bank had agreed to modify the terms of her loan.

All the bank had done at that point, however, was agree to provide her with an application that would allow her to request a loan modification. Because she later failed to qualify for the loan modification, the district court held that the bank had the right to seize her home. We affirm.

Andrea fell behind on her mortgage around the same time her marriage to Donald Gilbert fell apart. Any hope of staying in her home apparently hinged on Donald, whom the divorce court ordered to pay the mortgage in lieu of child support. Donald, sad to say, paid nothing, leaving Andrea (and their children) in the lurch. By early 2010, Andrea was ten monthly payments behind on the mortgage and lacked the resources to pay what she (in truth her former husband) owed.

She asked Wells Fargo if there was any way she could modify the terms of the loan. The bank told her about the federal Home Affordable Modification Program, which "encourage[s] mortgage holders to renegotiate qualifying loans to reduce the homeowner's mortgage payments to a sustainable level" and delays foreclosure while the bank reviews the homeowner for eligibility. *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 747 (6th Cir. 2014). That sounded like manna from heaven. Andrea gave Wells Fargo her financial information, including her estimated monthly income, and the bank told her that she "prequalified" for a modification. R. 44-12 at 12. "To be reviewed [further] for the [program]," the bank explained, she needed to complete a three-month trial period plan, apply for a permanent loan modification, and "provide [some] requested documentation," including her current income. *Id.* at 11–12. She made the three monthly trial payments and submitted her application, which listed her monthly income at $1545—$845 of which purportedly came from "Child Support/Alimony." R. 44-14 at 19. But she was never able to provide proof that she received the child-support payments because Donald never made them. The bank requested documentation of the payments at least five times,

including proof of "a Divor[ce] Decree" to show how long the payments would last and "proof of Child Support" to show she received the money each month. *Id.* at 26–27. Andrea responded that she "had neither [of the] documents" that the bank "told" her to send. *Id.*

Without the documents, the bank could not confirm that Andrea's income sufficed to modify the loan. The bank denied her application on May 18, 2010. Later efforts to modify the loan failed as well, and the bank foreclosed on her property on August 30, 2010. The bank assigned its interest to the Federal Home Loan Mortgage Corporation, better known as Freddie Mac.

Andrea refused to leave the home, prompting Freddie Mac to file an unlawful detainer action in Tennessee state court to evict her. Andrea counterclaimed against Freddie Mac (on several state law grounds) and filed a third-party claim against Wells Fargo, alleging it had agreed to modify her loan. Freddie Mac removed the case to federal court and, together with Wells Fargo, moved for judgment as a matter of law. *See* 12 U.S.C. § 1452(f). The district court dismissed many of Andrea's claims on the pleadings and granted the defendants summary judgment on the rest. With respect to Freddie Mac's eviction claim, the court denied Andrea's motion to dismiss for lack of subject matter jurisdiction, struck her answer as untimely, and set the case for trial. Before trial, the district court entered judgment for Freddie Mac on the remaining claim as a matter of law.

On appeal, Andrea challenges (1) the district court's summary judgment decision rejecting her state law claims against Wells Fargo, (2) its denial of her motion to dismiss Freddie Mac's eviction action, and (3) its decision to strike her answer to the eviction action.

*State law claims against Wells Fargo.* Andrea first claims that Wells Fargo breached a contract to modify her loan. But no such contract existed. Wells Fargo invited Andrea to *apply*

to modify her loan and offered to review her application *if* she complied with certain requirements. She applied. But she failed to meet the application's requirements, namely that she submit documentation of her current income. Her application thus remained just that. Now, as ever, an "application when made is not a contract." *Travelers Ins. Co. v. Wolfe*, 78 F.2d 78, 81 (6th Cir. 1935); *see Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011); *Canton Cotton Mills v. Bowman Overall Co.*, 257 S.W. 398, 402 (Tenn. 1924).

Look no further than the application itself to confirm the point. "The Trial Period Plan," it says, "is the first step" to permanent modification. R. 44-13 at 4. It "is not a modification of the Loan Documents" itself. R. 1-1 at 292. Permanent modification, it adds, does not occur "unless and until" Andrea satisfied "all of the conditions required for modification." *Id.* One such condition required Andrea to provide "documentation for all income" that she regularly received, including "any child support or alimony." *Id.* at 291. She thus needed to provide a copy of her divorce decree "that states the amount of the alimony or child support" and "[p]roof of full, regular and timely payments." R. 44-13 at 3. Yet, as Andrea admitted to the bank at the time, she sent "neither [of those] documents." R. 44-14 at 26–27. That meant she did not "meet all of the conditions required for modification," and that meant her application never became a loan-modification contract. R. 1-1 at 292.

Unfortunate though this conclusion may be, it is supported by communications between Wells Fargo and Andrea at the time. The bank told Andrea that "[i]f [her] income documentation does not support the income amount that [she] previously provided . . . [she] may not qualify for this loan modification program." R. 44-13 at 2. And Andrea recalled being "told" to provide the documentation and repeatedly called and wrote Wells Fargo to discuss the relevant documents. *E.g.*, R. 44-14 at 26–27. She said that she was still "waiting on [the]

Divor[ce] Decree + Child Sup.," *id.* at 25, and still "working on getting" the money and corresponding documents, *id.* at 26–27. But because her ex-husband, a one-time defendant in this saga and a less-than-admirable figure in it, never paid the child support, the money never came. Neither did any documentation of a payment. Neither did any binding contract to modify the mortgage.

Andrea tries to counter this conclusion on several grounds. She contends that she did supply sufficient documentation of her regular monthly income. But the document that she provided—the divorce court's February 2010 order for her to receive past-due and future child support—showed only that she expected to receive *future* payments, not that she had *actually* received "regular and timely" payments as Wells Fargo required. R. 44-13 at 3. Nor does Andrea's *pre*qualification for a loan modification mean that she was *in fact* qualified for one. *Cf. Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*, 810 F.3d 1161 (10th Cir. 2016). Her "income documentation," without the payments from Donald, could show a monthly income of only $700, which did "not support the income amount" of $1545 that she used to become prequalified. R. 44-13 at 2. Nor was anything amiss with Wells Fargo's denial letter. It gave Andrea sufficient notice of the denial. And it was issued "as quickly as possible," R. 44-13 at 5, with any delay attributable to the bank's "extension of time" for Andrea to "gather [her] documents," *id.* at 3. It's hard to fault the bank for working with Andrea to try to qualify her for the loan modification rather than denying the application the first chance it had.

Andrea persists that she made the three trial payments when she used the lump-sum award she received from Donald's past-due child support. But just because Andrea could make *past* payments based on a *past* lump-sum award does not prove that she could make *present* (to say nothing of *future*) payments on a "regular and timely" basis, as required. *Id.* In point of fact,

the past-due child support dried up quickly—after the three payments—and when it did, Andrea (no fault of her own) had no way to make any *ongoing* payments. The bank in the final analysis did not breach any contract with Andrea.

Andrea separately claims that the district court should not have rejected her promissory estoppel claim. But just as Andrea did not produce evidence of a *contract* to modify her loan, she did not produce evidence of a *promise* to do so either. Such a promise, we have insisted, "must be actual, clear, and definite—a conditional promise will not do." *Olson v. Merrill Lynch Credit Corp.*, 576 F. App'x 506, 511 (6th Cir. 2014) (quotation omitted). The Tennessee courts say the same thing. A promise "must be unambiguous and not . . . vague." *Amacher v. Brown-Forman Corp.*, 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991).

Andrea's problem is that Wells Fargo did not make an "actual, clear, and definite" or "unambiguous" promise to modify her loan. To the contrary, it told her that it didn't "guarant[ee] anything at all," R. 48-6 at 33, and used words like "may," "maybe," "if," "could," and "possibly" to back that up, *e.g.*, R. 44-8; R. 44-10; R. 44-12. "At most, [Wells Fargo] informed [Andrea] that she *might* qualify"—*if* she complied with all of its prerequisites. *Thompson*, 773 F.3d at 753 (emphasis added). But she did not comply. In the absence of a promise, Andrea's estoppel claim must fail. *Amacher*, 826 S.W.2d at 482; *see Alden v. Presley*, 637 S.W.2d 862, 864 (Tenn. 1982).

Andrea's wrongful foreclosure claim also comes up short. She acknowledged in the district court and in her opening appellate brief that, if her breach of contract and promissory estoppel claims failed, then her wrongful foreclosure claim must fail as well. That's because a Tennessee wrongful foreclosure claim does not amount to an independent cause of action in the Home Affordable Modification Program context. *Clay v. First Horizon Home Loan Corp.*,

392 S.W.3d 72, 79 (Tenn. Ct. App. 2012); *see Mik v. Fed. Home Loan Mortg. Corp.*, 743 F.3d 149, 166–67 (6th Cir. 2014).

Her contrary contention raised for the first time in her reply brief on appeal comes too late. *Jones v. Reynolds*, 438 F.3d 685, 695 (6th Cir. 2006). It would fail anyway. *See Clay*, 392 S.W.3d at 79.

No doubt, we have considerable sympathy for Andrea's "frustrating inability to procure a payment modification." *Thompson*, 773 F.3d at 753. The bank by all appearances was frustrated by that inability as well. But all of this does not give us a warrant to ignore the requirements of the application and Tennessee state law.

*Freddie Mac's eviction action.* The district court also correctly denied Andrea's motion to dismiss Freddie Mac's eviction action. Andrea contends that the district court lacked subject matter jurisdiction over the case. That is not the case, however. The "Freddie Mac" Act, *see* Federal Home Loan Mortgage Corporation Act, Pub. L. No. 91-351, Tit. III, §§ 301–310, 84 Stat. 450, 451–58 (1970), grants district courts "original jurisdiction" over "all civil actions to which [Freddie Mac] is a party." 12 U.S.C. § 1452(f). And it allows Freddie Mac to remove state-court cases to federal court that name it as a party. *Id.* That's all Freddie Mac did here.

Andrea responds that the state court from which Freddie Mac removed the case lacked jurisdiction, which deprived the federal court of jurisdiction as well. Known as "derivative jurisdiction," this theory holds that a "federal district court does not acquire subject matter jurisdiction by removal if the state court lacked jurisdiction over the original action." *W. & S. Life Ins. Co. v. Smith*, 859 F.2d 407, 409 n.4 (6th Cir. 1988). The doctrine, for what it is worth, appears to be on its last legs. *See* 14B Charles Alan Wright et al., Federal Practice and Procedure § 3721 (4th ed. 2016) (collecting materials). Congress notably has abolished it for

cases removed under the general removal statute. 28 U.S.C. § 1441(f). Yet the parties agree that it applies here because Freddie Mac relied on the Freddie Mac Act, not the general removal statute, to remove the case. *See, e.g.*, *Lopez v. Sentrillon Corp.*, 749 F.3d 347, 351 (5th Cir. 2014); *Palmer v. City Nat'l Bank, of W. Va.*, 498 F.3d 236, 246 (4th Cir. 2007).

Assume then that the doctrine, even if just for argument's sake, applies. And assume, again for argument's sake, that the doctrine is "jurisdictional" in the sense that it goes to our power to hear the case. *But see Morda v. Klein*, 865 F.2d 782, 784 (6th Cir. 1989); *Rodas v. Seidlin*, 656 F.3d 610, 619–25 (7th Cir. 2011). Even so, the district court had jurisdiction because the state court had jurisdiction. An overview of the Tennessee court system shows why. Tennessee general sessions courts, where Freddie Mac initiated this lawsuit, are akin to small claims courts. They have limited jurisdiction (over cases such as eviction actions), and their judgments do not bind losing parties that appeal to general trial courts, known as circuit courts. *See Ware v. Meharry Med. Coll.*, 898 S.W.2d 181, 183–84 (Tenn. 1995); *see* Tenn. Code Ann. §§ 27-5-108(a)(1), 29-18-128. The general trial courts acquire jurisdiction over the case so long as the losing party files its appeal within ten days of the adverse judgment and "give[s] bond with good security . . . for the costs of the appeal." *Id.* §§ 27-5-101, -103(a).

Freddie Mac met these state law requirements, giving the state court—and thus the federal court—jurisdiction over the case. After it lost at the general sessions court, it filed an appeal within ten days, and it used a surety bond for the appeal costs. The Tennessee circuit court made note of the bond on its docket and properly asserted jurisdiction over the case. Contrary to Andrea's argument, Tennessee law requires nothing more. It contains no specific signature requirement, no type-of-surety requirement, no form-of-payment requirement. *See Griffin v. Campbell Clinic, P.A.*, 439 S.W.3d 899, 905 (Tenn. 2014); Tenn. Code Ann. § 16-15-

729. It says only that "[a]n appeal bond . . . shall be considered sufficient if it secures the cost of the cause on appeal." *Id.* § 27-5-103(b). That's all. And that's what Freddie Mac's appeal bond did. The district court properly denied Andrea's motion to dismiss.

*Leave to file an answer.* The court also acted within its discretion in denying Andrea leave to file her answer over a year and a half too late—on the night before the joint pretrial order was due and less than a month before trial. Andrea submitted this late filing without the required motion to extend her time to file, *see* Fed. R. Civ. P. 6(b)(1)(B), which in some quarters dooms the request by itself. *Unicorn Tales, Inc. v. Banerjee*, 138 F.3d 467, 470 (2d Cir. 1998); *see B & D Partners v. Pastis*, No. 05-5954, 2006 WL 1307480, at *2 (6th Cir. May 9, 2006). Yet the district court (graciously) considered whether to allow the filing, using the late-filing "excusable neglect" standard that Andrea urged. *See* Fed. R. Civ. P. 6(b)(1). The court nonetheless determined that the alleged "oversight" by Andrea's lawyer—forgetting to file—did not excuse the late filing. R. 77 at 16; *see McNeil v. United States*, 508 U.S. 106, 113 (1993).

On appeal, Andrea argues that the district court applied the wrong standard—that it should have applied the more lenient Civil Rule 55(c) "good cause" standard applicable to excuse default judgments. At least one court, it is true, has applied this standard to excuse a late-filed answer when doing so avoided a default judgment. *See Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1339 (11th Cir. 2014). But in this case there was no default judgment to avoid. The district court *denied* Freddie Mac's request for a default judgment at the same time it denied Andrea's motion to file a very late answer. What's more, the district court applied the standard Andrea urged it to apply. We generally do not allow litigants to move the goalposts on appeal, particularly when they set the goalposts in the first place and offer no good reason for making a

change on appeal. *See Greco v. Livingston County*, 774 F.3d 1061, 1064 (6th Cir. 2014); *United States v. LaBarge*, 52 F. App'x 216, 219 n.1 (6th Cir. 2002).

For these reasons, we affirm.

SUTTON, Circuit Judge, concurring. There is one interesting feature to this dispute, not necessary to resolution of the case and therefore not explored in the majority opinion, but worth a few separate thoughts. The question is: When a case is removed from state court to federal court, does the state court's lack of jurisdiction deprive the federal court of jurisdiction as well?

Andrea Gilbert says it does. Because the state court from which Freddie Mac removed the eviction action allegedly did not have jurisdiction over it, Andrea maintains, the federal court necessarily lacked subject matter jurisdiction. In making this argument, Andrea invokes "derivative jurisdiction," a doctrine that purports to limit the removal jurisdiction of the federal courts "if the state court lacked jurisdiction over the original action." *W. & S. Life Ins. Co. v. Smith*, 859 F.2d 407, 409 n.4 (6th Cir. 1988).

The court's opinion holds that we have jurisdiction regardless, because the state court had jurisdiction over the original eviction action. But it's worth asking whether, even if that weren't true, even if the state court lacked jurisdiction, our subject matter jurisdiction would be altered. My answer is no: Federal removal subject matter jurisdiction is not dependent on, or for that matter "derivative" of, the jurisdictional rules of the state courts.

Once "well settled," *Arizona v. Manypenny*, 451 U.S. 232, 243 n.17 (1981); *see Lambert Run Coal Co. v. Balt. & Ohio R.R. Co.*, 258 U.S. 377, 382 (1922), the concept of derivative jurisdiction appears to be on its last legs. *See* 14B Charles Alan Wright et al., Federal Practice and Procedure § 3721 (4th ed. 2016); Erwin Chemerinsky, Federal Jurisdiction § 5.5, at 288 (1989). The key problem with its use here is that the United States Constitution and federal statutes, taken together, give federal courts subject matter jurisdiction to entertain cases removed from state courts that arise under federal law or that involve diverse parties. Nothing in any of the federal removal statutes makes the subject matter jurisdiction of the federal courts turn on the

underlying jurisdiction of the state courts over the dispute *under state law.  See Breuer v. Jim's Concrete of Brevard, Inc.*, 538 U.S. 691, 694 (2003).

Any other approach would create intractable oddities.  Suppose a case could be brought *only* in federal court.  A patent case offers one example.  *See* 28 U.S.C. § 1338(a).  An ERISA case offers another example.  *See* 29 U.S.C. § 1132(e)(1).  And there are many more:  admiralty, maritime, and prize actions, 28 U.S.C. § 1333; copyright lawsuits, *id.* § 1338(a); Title 11 bankruptcy actions, *id.* § 1334(a); claims under the Federal Tort Claims Act, *id.* § 1346(b)(1); challenges to some federal agency actions, *e.g.*, 33 U.S.C. § 1369(b) (Clean Water Act); claims under the Securities Exchange Act of 1934, 15 U.S.C. § 78aa(a); federal antitrust actions, *see, e.g.*, *Gen. Inv. Co. v. Lake Shore & Mich. S. Ry. Co.*, 260 U.S. 261, 286–88 (1922); and other more obscure cases, *e.g.*, 22 U.S.C. § 290k-11(b) (cases challenging an award of an arbitral tribunal under the Convention Establishing the Multilateral Investment Guarantee Agency); 16 U.S.C. § 2440 (cases arising under the Antarctic Marine Living Resources Convention).

Suppose as well that the claimant nonetheless brings this kind of case in state court.  The conventional option for the defendant, the one Congress established, would be to remove the case to federal court, where the plaintiff could (and should) have brought the original lawsuit.  Now suppose the plaintiff does not protest, does not invoke derivative jurisdiction, and thus does not claim that the federal court lacks jurisdiction because the state courts lacked jurisdiction.  Discovery commences.  Pretrial proceedings move forward.  Summary judgment motions appear.  If the plaintiff loses at summary judgment (or for that matter after a jury trial), may it move to dismiss the action for lack of subject matter jurisdiction?  The answer is yes if, as Andrea claims today, the concept of derivative jurisdiction goes to the subject matter jurisdiction of the federal courts.  And this in a setting where the federal court has original jurisdiction—in

reality, exclusive jurisdiction—over the case, and the state courts no jurisdiction over the matter. "The result is that a federal court refuses to entertain a case over which only it has jurisdiction." *North Dakota v. Fredericks*, 940 F.2d 333, 336 (8th Cir. 1991). This problem by the way would apply in *all* such cases misfiled in state court—a not-unusual situation, particularly for ERISA cases—because, if the federal courts have exclusive jurisdiction, the state courts would lack jurisdiction and derivative jurisdiction would apply.

The only recourse at this point would be for the plaintiff to refile in federal court (assuming no limitations bar applied). And the upshot would be the "kind of rigmarole [] unworthy of a civilized judicial system," *id.*, and "indefensibl[e] from the standpoint of practical judicial administration," *Washington v. Am. League of Prof'l Baseball Clubs*, 460 F.2d 654, 658–59 (9th Cir. 1972); *see also Hollis v. Fla. State Univ.*, 259 F.3d 1295, 1298 (11th Cir. 2001); *Patriot Cinemas, Inc. v. Gen. Cinemas Corp.*, 834 F.2d 208, 218 (1st Cir. 1987).

Appreciating these problems, Congress in 1986 abolished the concept of derivative jurisdiction for some cases—those removed under the general removal statute, *see* Judicial Improvements Act of 1985, Pub. L. No. 99-336, 100 Stat. 633—and did so again in 2002 with slightly different language, *see* 28 U.S.C. § 1441(f). But "for no apparent policy reason," Congress appears to have "limit[ed] the abrogation . . . to cases removed under" that statute. Wright et al., *supra*, § 3721. The doctrine lives on, some courts have held, for actions removed under other removal statutes, such as the federal officer removal statute. *See, e.g.*, *Conklin v. Kane*, No. 14-4106, 2015 WL 8125304, at *2 (3d Cir. Dec. 8, 2015); *Palmer v. City Nat'l Bank of W. Va.*, 498 F.3d 236, 246 (4th Cir. 2007); *Lopez v. Sentrillon Corp.*, 749 F.3d 347, 351 (5th Cir. 2014); *Rodas v. Seidlin*, 656 F.3d 610, 618–19 (7th Cir. 2011).

In this instance the government relied on the "Freddie Mac" Act, *see* Federal Home Loan Mortgage Corporation Act, Pub. L. No. 91-351, Tit. III, §§ 301–310, 84 Stat. 450, 451–58 (1970), not the general removal statute, in removing the case to federal court. *See* 12 U.S.C. § 1452(f). For that reason, the parties agree that some form of the doctrine applies here.

What form, is the key question. That the doctrine may apply does not tell us how it applies. The answer to that question depends on the interpretation of a word with "many, too many meanings": "jurisdiction." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) (quotation omitted).

Once used as shorthand for anything "mandatory," *see, e.g.*, *United States v. Robinson*, 361 U.S. 220, 229 (1960), "jurisdiction" now refers to "the courts' statutory or constitutional *power* to adjudicate the case," *Steel Co.*, 523 U.S. at 89. A careful use of the term covers far fewer disputes than was once the case. *See id.*; *see also, e.g.*, *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514–15 (2006); *United States v. Al-Maliki*, 787 F.3d 784, 790–91 (6th Cir. 2015).

The derivative jurisdiction doctrine, properly understood, does not go to the federal courts' subject matter jurisdiction—their power—to review a case. Despite its "improvident name," the doctrine "is best understood as a procedural bar to the exercise of federal judicial power" rather than "an essential ingredient to federal subject matter jurisdiction." *Rodas*, 656 F.3d at 619. We have said as much. *Morda v. Klein*, 865 F.2d 782, 784 (6th Cir. 1989). So has every other circuit but one. *Compare Patriot Cinemas*, 834 F.2d at 217–18, *Calhoun v. Murray*, 507 F. App'x 251, 256 (3d Cir. 2012), *Foval v. First Nat'l Bank of Commerce in New Orleans*, 841 F.2d 126, 129 (5th Cir. 1988), *Rodas*, 656 F.3d at 619, *and Sorosky v. Burroughs Corp.*, 826 F.2d 794, 800–01 (9th Cir. 1987), *with Bullock v. Napolitano*, 666 F.3d 281, 286 (4th Cir. 2012). And even *Bullock* did so without confronting the argument that the doctrine is

14

merely a procedural bar. *See* Appellant's Br., *Bullock v. Napolitano*, 666 F.3d 281 (No. 10-1222) 2010 WL 2592618.

Not only does the doctrine lead to strange outcomes, it has no constitutional or statutory basis and appears to have been "subject to qualification" from the beginning. *Fid. Trust Co. v. Gill Car Co.*, 25 F. 737, 739 (C.C.S.D. Ohio 1885) (cited in *Lambert Run Coal*, 258 U.S. at 383 n.3); *see Rodas*, 656 F.3d at 624–25 (collecting cases). This conclusion also furthers the "mission to rein in profligate uses of 'jurisdiction,'" *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 813 (6th Cir. 2015), a mission that we do not undertake alone, *see, e.g.*, *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 824 (2013); *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434–35 (2011); *Union Pac. R.R. Co. v. Locomotive Eng'rs*, 558 U.S. 67, 81 (2009); *Arbaugh*, 546 U.S. at 514–15; *Steel Co.*, 523 U.S. at 89–90; *Al-Maliki*, 787 F.3d at 790–91; *EEOC v. Watkins Motor Lines, Inc.*, 553 F.3d 593, 595–96 (7th Cir. 2009).

That derivative jurisdiction counts as a procedural defect, not a subject-matter-jurisdiction defect, "makes an enormous practical difference." *Al-Maliki*, 787 F.3d at 790–91. "Challenges to subject-matter jurisdiction cannot be waived or forfeited," but procedural challenges to other types of so-called "jurisdiction" (like derivative jurisdiction) "can be forfeited by litigants" and "can be outright waived." *Id.*; *see Smith*, 859 F.2d at 409 n.4. That's what happened here. Because Andrea's challenge alleged a "defect other than lack of subject matter jurisdiction," it "must [have] be[en] made within 30 days" of Freddie Mac's removal. 28 U.S.C. § 1447(c); *see Rodas*, 656 F.3d at 621. It was not. Andrea waited eleven months to make her motion—until after she lost at summary judgment—and thus would have forfeited her challenge. *See Music v. Arrowood Indem. Co.*, 632 F.3d 284, 287 (6th Cir. 2011); *Gentek Bldg. Prods., Inc.*

*v. Sherwin-Williams Co.*, 491 F.3d 320, 327–29 (6th Cir. 2007). She cannot resurrect it now by using a jurisdictional label.

The only pertinent jurisdictional question here is "not whether the case was properly removed, but whether the federal district court would have had original jurisdiction of the case had it been filed in that court." *Grubbs v. Gen. Elec. Credit Corp.*, 405 U.S. 699, 702 (1972). The answer is yes. The Freddie Mac Act grants district courts "original jurisdiction" over "all civil actions to which [Freddie Mac] is a party." 12 U.S.C. § 1452(f). And it allows Freddie Mac to remove state court cases that name it as a party to federal court. *Id.* That's just what Freddie Mac did. I suspect, therefore, that the district court properly exercised jurisdiction over this case, even applying the doctrine of derivative jurisdiction.